**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Richard O. SINGER, Defendant–**
**Appellant.**

No. 03–15801

**Non–Argument Calendar.**

**D.C. Docket No. 03–00005–**
**CR–FTM–2DNF.**

United States Court of Appeals,
Eleventh Circuit.

Oct. 14, 2005.

Susan Hollis Rothstein–Youakim, U.S. Attorney's Office, Tampa, FL, for Plaintiff–Appellee.

Russell K. Rosenthal, Federal Public Defender's Office, Fort Myers, FL, Craig L. Crawford, Federal Public Defender's Office, R. Fletcher Peacock, Orlando, FL, for Defendant–Appellant.

Before TJOFLAT, MARCUS and PRYOR, Circuit Judges.

## SUBSTITUTED OPINION

PER CURIAM:

Appellant's motion to rescind our January 6, 2005 opinion is GRANTED. We VACATE our prior opinion in this case and substitute the following in its place. We DENY Appellant's motion to reinstate the briefing schedule as moot:

Richard O. Singer appeals his conviction, imposed pursuant to a jury verdict, and 60–month sentence for conspiracy to commit bank fraud, in violation of 18 U.S.C. §§ 371 and 1344, and the district court's order finding him jointly and severally liable for $144,104.22 in restitution to merchants who were victims of the conspiracy. On appeal, Singer argues that the district court erred by: (1) denying his motion for judgment of acquittal because the government presented insufficient evidence to show that federally-insured banks, as opposed to non-bank entities, were the actual or intended victims of the criminal scheme; (2) miscalculating the fraud-loss amount under U.S.S.G. § 2F1.1(b)(1); (3) assessing a four-level leadership-role enhancement under U.S.S.G. § 3B1.1(a); (4) applying a two-level enhancement under U.S.S.G. § 2F1.1(b)(5)(C) for the use of a means of identification to unlawfully produce other means of identification; and (5) ordering that restitution be paid to the defrauded merchants.

We review *de novo* the sufficiency of the evidence supporting a criminal conviction. *United States v. McCrimmon*, 362 F.3d 725, 728 (11th Cir.2004). We view "the evidence in the light most favorable to the government, making all reasonable infer-

ences and credibility choices in the government's favor to determine whether a rational jury could have found the defendant guilty beyond a reasonable doubt." *Id.* The verdict will not be disturbed unless no reasonable jury could have found guilt beyond a reasonable doubt. *Id.* As for Singer's sentencing issues, we review the district court's application of the Sentencing Guidelines *de novo,* and its findings of fact for clear error. *United States v. Snyder,* 291 F.3d 1291, 1295 (11th Cir.2002). The district court's determinations of the amount of loss and a defendant's role as an organizer or leader are factual findings reviewed for clear error. *United States v. Yeager,* 331 F.3d 1216, 1224 (11th Cir.2003) (amount of loss); *United States v. De Varon,* 175 F.3d 930, 937 (11th Cir.1999) (*en banc* ) (role as organizer or leader). Finally, we review a district court's restitution order for an abuse of discretion, but the legality of such an order is reviewed *de novo. United States v. Yeager,* 331 F.3d 1216, 1227 (11th Cir.2003).

Upon thorough review of the record, including the trial and sentencing transcripts and the presentence investigation report ("PSI"), and careful consideration of the parties' briefs, we find no reversible error and affirm.[1]

The relevant facts are these. On January 22, 2003, Singer and his co-conspirator, Craig Richard Ambrose, were charged with one count of conspiracy to defraud federally insured depository financial institutions, in violation of 18 U.S.C. § 371. In relevant part, the indictment alleged that Singer and others fraudulently obtained information about the bank accounts of other persons, which information the conspirators used to create fraudulent checks

and identification cards. The conspirators then used the fraudulent checks and identification cards to purchase merchandise at stores in Florida. The indictment also included a forfeiture count. Ambrose entered a guilty plea and Singer proceeded to a jury trial.

At trial, the government presented the following testimony. Christopher Van Kahlmorgan, a co-conspirator, identified his co-conspirators as Singer, Ambrose, John Norris, Brad Nelson, and Sherri Mulkey. Kahlmorgan had first learned about the scheme from Ambrose who told Kahlmorgan that he (Ambrose) had a friend who produced fraudulent identification cards and checks, which were then used at various stores throughout Florida. Kahlmorgan subsequently was introduced to Singer, who was described as the person "responsible for producing the ID's and checks." At this meeting, Singer took Kahlmorgan's photograph and proceeded to produce several identification cards and checks from matching checking accounts. Kahlmorgan then used the fraudulent materials to purchase merchandise and generate cash via cashing checks. Kahlmorgan said that Norris and Singer explained to him that the account numbers and names used on the duplicate counterfeit checks came from either original checks stolen from mailboxes or names taken from the phone book.

Kahlmorgan described the sophisticated computer and digital imaging equipment Singer used to create the fraudulent identification cards and checks and estimated that Singer had created "at least" 100 identifications cards for Kahlmorgan alone and had provided a minimum of 10 to 20 checks per identification card. Kahlmor-

---

**1.** Appellant's "Petition for Rehearing *En Banc* From September 8, 2004 Order Denying Leave to File Supplemental Brief Regarding *Blakely v. Washington* and To Stay Briefing

Schedule" is DENIED. *See United States v. Hembree,* 381 F.3d 1109, 1110 (11th Cir. 2004).

gan estimated that the total dollar amount of the bogus checks that he wrote was "[a]t least $150,000."

 Kahlmorgan also testified that he and Singer had created fake payroll checks on commercial bank accounts that were cashed at various grocery stores in order to obtain cash.[2] After cashing the payroll checks, the conspirators used the proceeds to purchase large-ticket items that were then resold at a discount, with Singer and Kahlmorgan splitting the cash proceeds equally. On most occasions, Singer would accompany Kahlmorgan to the stores to select the items to be purchased and to act as a look-out. Kahlmorgan thereafter reviewed, and narrated for the jury, several surveillance tapes from targeted stores, which showed Singer selecting and carrying various items to the check-out counter. Kahlmorgan described Singer as the "ring leader" of the conspiracy because he had the ability to manufacture driver's licenses and counterfeit checks in an authentic manner so as "to be usable and acceptable at pretty much any given store."

Co-conspirator Norris also testified against Singer, stating that he had known Singer for seven or eight years and had been involved with passing bad checks from the mid–1990s until the end of 2000. Norris's testimony about the scheme, and Singer's role in it, was substantially similar to Kahlmorgan's description. Although Norris could not accurately estimate the number of checks that Singer had provided to him, Norris stated that he personally had passed between $250,000 and $300,000 in bad checks during the seven or eight years he was associated with Singer.

Finally, the government presented the testimony of several officials of the drawee banks, each of whom stated that their respective bank did not suffer any monetary loss—but did lose some man hours in processing the bad checks—and that the fraudulent checks were returned to the merchants.

After the government rested, Singer moved for a judgment of acquittal, arguing the government failed to show that (1) any of the banks suffered an actual loss, or (2) Singer had entered an agreement with another individual to defraud the banks themselves, as opposed to defrauding the targeted merchants. The district court

---

**2.** At trial, Singer objected to the admission of evidence concerning the fraudulent use of business payroll checks to obtain cash. On appeal, Singer argues that the indictment was constructively amended when the government presented evidence that, in addition to passing fraudulent *personal* checks to merchants in exchange for *merchandise*, co-conspirators also had presented fraudulent *business* payroll checks in order to obtain *cash*. "An amendment to an indictment occurs 'when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment.' " *United States v. Dennis*, 237 F.3d 1295, 1299 (11th Cir. 2001) (citations omitted). In other words, "[a] constructive amendment occurs when the evidence presented at trial and the jury instructions so modify the elements of the offense charged that the defendant may have been convicted on a ground not alleged by the grand jury's indictment." *United States v. Davis*, 679 F.2d 845, 851 (11th Cir.1982) (internal quotation marks and citation omitted); *cf. United States v. Flynt*, 15 F.3d 1002, 1005–06 (11th Cir.1994) (distinguishing constructive amendment from variance: "The distinction between the two terms is important because constructive amendment of the indictment is per se reversible error. A variance, on the other hand, requires reversal only when the defendant can establish that his rights were substantially prejudiced thereby" (internal quotation marks and citations omitted)). On this record, we cannot find the evidence presented at trial "so modified the elements of the offense" with which Singer was charged so as to constitute reversible error resulting from an alleged constructive amendment of the indictment.

denied Singer's motion. The defense then rested without calling any witnesses. The jury found Singer guilty as charged and he proceeded to sentencing.

Singer's base offense level was 6, pursuant to U.S.S.G. § 2F1.1(a). The PSI recommended the following adjustments: (1) a 9–level increase for a fraud loss exceeding $350,000 but less than $500,000, U.S.S.G. § 2F1.1(b)(1)(J); (2) a 2–level increase for Singer's use of a means of identification unlawfully to produce any other means of identification, U.S.S.G. § 2F1.1(b)(5)(C); (3) a 2–level increase for more than minimal planning, U.S.S.G. § 2F1.1(b)(2); and (3) a 4–level leadership-role enhancement, U.S.S.G. § 3B1.1(a). With an adjusted offense level of 23 and a criminal history category III, Singer's sentencing guidelines range was 57 to 71 months' imprisonment, but based on the 5–year statutory maximum enumerated in 18 U.S.C. § 371, Singer's maximum sentence was 60 months' imprisonment. The PSI also found that Singer was required to make mandatory restitution totaling $144,104.22 to dozens of defrauded merchants.

At the sentencing hearing, in response to Singer's objections, the government presented additional testimony concerning Singer's role in the conspiracy and the amount of loss. Norris described Singer's participation in the conspiracy as including: (1) recruiting Norris to be a "front man"; (2) making arrangements for the buying trips; (3) deciding which items to purchase, and (4) selecting the cities in which the purchases would be made. Norris testified that, on average, he presented approximately $6,700 in bad checks per account, using 1 account per month for 3 years.

Ambrose, the co-conspirator who had been charged with Singer and had pled guilty, also testified at the sentencing hearing, describing how Singer told other participants "where [they] were going to go, when [they were] going to go," and what items each person would purchase. Ambrose contended that he had written approximately $400,000 total in bad checks over the course of two-and-a-half years. Kalhmorgan also testified, reiterating his trial testimony, including that he had presented approximately $150,000 in bad checks.

On the fraud-loss issue, the district court explicitly found that the testimony of Norris, Ambrose, and Kahlmorgan was credible, but that their estimates of the amount of bad checks they passed was overstated. The court stated that it did not "have any problems concluding from the evidence that there's at least the $200,000 worth," but found the government had not met its burden as to the requested $350,000 loss amount. Thus, the court partially sustained Singer's objection to the enhancement, reducing the § 2F1.1(b)(1) enhancement from nine levels to eight levels. See U.S.S.G. § 2F1.1(b)(1)(I). The court overruled Singer's objection to the leadership-role enhancement based on the government's evidence that the scheme was Singer's idea, and that Singer took the larger share of the proceeds, personally selected most of the merchandise to be purchased, and directed those on the "front line" who actually were passing the bad checks. The court also upheld the § 2F1.1(b)(5)(C) enhancement, finding that the conspirators stole checks from the mail and used the stolen checks to create false identification cards, which, in turn, were used to pass bad checks. Finally, the court found that restitution to the merchants was appropriate because the merchants, and not just the banks, were the victims of the offense. The district court sentenced Singer to a 60–month term of imprisonment, followed

by 3 years' supervised release, and ordered that he pay $144,104.22 in restitution, jointly and severally with Ambrose. This appeal followed.

■ First, Singer argues the evidence was insufficient to convict him of conspiracy to commit bank fraud because the government did not establish that federally insured banks, as opposed to non-bank entities (the merchants), were either the actual or intended victims of the conspiracy, as required by 18 U.S.C. § 1344. To sustain a conviction under 18 U.S.C. § 371, the government must prove (1) the existence of an agreement to achieve an unlawful purpose; (2) the defendant's knowing and voluntary participation in the conspiracy; and (3) the commission of an overt act in furtherance of the conspiracy. *United States v. Adkinson,* 158 F.3d 1147, 1153 (11th Cir.1998). To convict a defendant for bank fraud under 18 U.S.C. § 1344(1) for defrauding a financial institution, the government must prove that (1) the defendant intentionally participated in a scheme or artifice to defraud another of money or property; and (2) the intended victim of the scheme or artifice was a federally-insured financial institution. *United States v. McCarrick,* 294 F.3d 1286, 1290 (11th Cir.2002).

While we have not directly addressed the situation of a non-bank entity as the victim of a bank-fraud offense under 18 U.S.C. § 1344, in an analogous context, we have observed that a bank is not the only possible victim of a § 1344 offense for purposes of applying an abuse-of-trust sentencing enhancement under U.S.S.G. § 3B1.3. *See United States v. Linville,* 228 F.3d 1330, 1332 (11th Cir.2000). In that case, we contrasted the bank-fraud statute with the Medicare-fraud statute, 42 U.S.C. § 1320, noting that under the latter, the United States as a matter of law is the only victim of a Medicare-fraud offense since "the government is the only entity that pays directly out of pocket for the losses." *Id.* at 1332. Under the more broadly worded bank-fraud statute, however, we explained that "[a] bank is a possible victim, of course, but so are other persons, because the fraudulent scheme need only be 'to obtain money, funds, or credits *under the custody or control* of a federally insured financial institution.' " *Id.* (emphasis in original) (citation omitted). Noting that "money under the custody or control of the bank is not necessarily money whose loss the bank is responsible for," we held that the bank-fraud statute contemplates a larger class of victims than the Medicare-fraud statute, and, depending on the facts of the case, more than one person, including a non-bank entity, could be the victim who reposes trust in the defendant within the meaning of § 3B1.3. *Id.*[3]

Applying the underlying reasoning of *Linville,* as well as the persuasive authori-

---

**3.** Other circuits to have directly considered the issue have held that a bank need not be the immediate victim of the fraudulent scheme and need not suffer an actual loss, so long as the defendant acts with the requisite intent. *United States v. Crisci,* 273 F.3d 235, 240 (2d Cir.2001). In *Crisci,* the Second Circuit held that a defendant's knowing negotiation of a check with a forged endorsement was sufficient to show the defendant's intent to defraud a bank, even though the check was presented to a third party and not directly to a bank. *Id.* Likewise, in *United States v.* *Brandon,* 298 F.3d 307, 312 (4th Cir.2002), the Fourth Circuit also held that the bank need not be the immediate victim or suffer actual loss, and that it was sufficient for the government to show that the defendant's scheme exposed the bank to the potential risk of loss. The Fourth Circuit noted that the defendant's scheme of passing forged checks to merchants in exchange for goods satisfied the statute because it was inevitable that the bogus checks would eventually be presented to the drawee bank and expose the bank to the risk of loss. *Id.*

ty of the Second and Fourth Circuits, Singer's claim that the government's evidence was insufficient is unpersuasive. Although the evidence presented at trial demonstrated that the *immediate* victims of the scheme were the third-party merchants from whom conspirators either purchased goods or obtained cash, the jury reasonably could have concluded that the conspirators' fraudulent checks ultimately would be presented to the drawee banks for payment. *See Brandon,* 298 F.3d at 312. Moreover, the mere negotiation of a check with a forged endorsement is sufficient to demonstrate the defendant's requisite intent to defraud the bank and to expose the bank to the risk of loss. *See Crisci,* 273 F.3d at 240; *Brandon,* 298 F.3d at 312. As such, the jury reasonably could have concluded that Singer's scheme was designed "to obtain money, funds, or credits under the custody or control of a federally insured financial institution." *See Linville,* 228 F.3d at 1332.

■ Singer also argues that the district court erred in calculating the fraud-loss amount under U.S.S.G. § 2F1.1(b)(1). Specifically, Singer contends that the district court's finding that his relevant fraud loss was at least $200,000 was based on speculative and uncorroborated testimony, and that the court, instead, should have considered the amount of only those counterfeit checks that actually passed through the banking system and created a verifiable "paper trail." We disagree.

Section 2F1.1(a) of the applicable version of the Sentencing Guidelines (2000) assigns a base offense level of six for a wide variety of fraud crimes. *See United*

*States v. Bracciale,* 374 F.3d 998, 1003 (11th Cir.2004); U.S.S.G. § 2F1.1(a). That base offense level then is increased under § 2F1.1(b) based on the amount of loss resulting from the fraud in order to "measure the actual, attempted, or intended harm of the offense." *Bracciale,* 374 F.3d at 1003 (citation omitted). Where a defendant contests the amount of loss, the government bears the burden of establishing the amount of the loss by a preponderance of the evidence. *See United States v. Dabbs,* 134 F.3d 1071, 1081 (11th Cir.1998).

■ At the sentencing hearing, the government presented the testimony of Singer's co-conspirators on the amount of loss. While Singer contends that this testimony was not credible, he presented no evidence to rebut the government's case at sentencing, and the district court made a finding that the co-conspirators' testimony was credible insofar as it supported an adjustment for a loss amount exceeding only $200,000 (but not $350,000). *See United States v. McPhee,* 336 F.3d 1269, 1275 (11th Cir.2003) ("[W]e allot substantial deference to the factfinder, in this case, the district court, in reaching credibility determinations with respect to witness testimony.") (internal marks and citation omitted). Simply put, the government established, by a preponderance of the evidence, the attempted loss amount exceeded $200,000 and, therefore, the district court did not clearly err in applying a 8–level enhancement, pursuant to U.S.S.G. § 2F1.1(b)(1)(I).[4]

■ We are likewise unpersuaded by Singer's argument that the district court

---

4. Based on the same reasoning, we reject Singer's second sentencing argument, that the district court erred by applying a leadership-role enhancement under U.S.S.G. § 3B1.1(a). Again, Singer criticizes the credibility of his co-conspirators' testimony. As with the fraud-loss amount, the government's burden to establish a defendant's leadership role is a

preponderance of the evidence. *See United States v. Yeager,* 331 F.3d 1216, 1226 (11th Cir.2003). The government's evidence, both at trial and at sentencing, showed that Singer devised the scheme, created the fraudulent checks and identification cards using his computer and technical expertise, and accompanied other conspirators while purchasing

erred by applying a two-level enhancement under U.S.S.G. § 2F1.1(b)(5)(C) for the use of a means of identification to unlawfully produce other means of identification. Singer contends that the original checks the conspirators stole from mailboxes—the checks that were used to create fraudulent checks for the conspirators' use—were not "means of identification" within the meaning of § 2F1.1(b)(5)(C), which provides for a two-level increase of a defendant's base offense level "[i]f the offense involved ... the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification." U.S.S.G. § 2F1.1(b)(5)(C)(i) (2000).

Application Note 15 to § 2F1.1 provides that " '[m]eans of identification' has the meaning given that term in 18 U.S.C. § 1028(d)(3)." U.S.S.G. § 2F1.1, comment. (n. 15) (2000). Section 1028(d)(3) defines the term as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any ... name, social security number, date of birth, official State or government issued driver's license or identification number, ... unique electronic identification number, address, or routing code." 18 U.S.C. § 1028(d)(3)(A), (C) (1999).[5]

Application Note 16 to § 2F1.1 further enumerates several examples of when the § 2F1.1(b)(5)(C)(i) enhancement should apply, including where (1) the defendant obtains another individual's name and social security number from a stolen piece of mail and uses that information to obtain a bank loan in that individual's name; or (2) the defendant obtains another individual's name and address from a driver's license in a stolen wallet, which the defendant then uses to open a credit card account in that individual's name. *See* U.S.S.G. § 2F1.1, comment. (n.16). By contrast, the enhancement should *not* apply when (1) the defendant uses a credit card from a stolen wallet to make a purchase; or (2) the defendant forges another individual's signature to cash a stolen check, because in neither of those two situations has the defendant produced or obtained another means of identification. *Id.* Here, because Singer used true bank account holders' names to create fraudulent identification cards and checks, his conduct is akin to the former examples, to which the enhancement applies, rather than the latter examples, which do not involve creating fraudulent means of identification. Simply put, the district court correctly applied § 2F1.1(b)(5)(C) in this case.

■ Finally, Singer argues that the district court erred by ordering him to pay restitution to the targeted merchants, whom Singer contends were not victims of the bank fraud. Singer differentiates between the stores' losses resulting from the merchandise acquired via the fraudulent checks, and "the monies taken from their bank accounts by the offense conduct." We are unconvinced.

The Mandatory Victims Restitution Act ("MVRA"), codified as amended, 18 U.S.C. § 3663A, applies to all offenses, such as the instant case, when the defendant commits a crime involving "fraud or deceit."

---

merchandise. In addition, Singer's selection of merchandise was given priority, and each coconspirator split the proceeds from the sale of their own stolen goods with Singer. Singer also decided where and when to pass the fraudulent checks, and provided transportation to other coconspirators when necessary. As with the government's evidence to support the fraud-loss enhancement, Singer presented no evidence at sentencing to rebut the government's case, and, thus, a preponderance of the evidence supports the enhancement.

5. Subsection (d)(3) has been rewritten and is now subsection (d)(7). *See* 18 U.S.C. § 1028 (2004).

18 U.S.C. § 3663A(c)(1)(A)(ii). Under the MVRA, a person is required to make full restitution when he is convicted for an offense "in which an identifiable victim or victims has suffered a physical injury or a pecuniary loss." 18 U.S.C. § 3663A(c)(1)(B). The MVRA defines "victim" as

[A] person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663A(a)(2). Here, the targeted merchants were the *primary* victims of Singer's fraudulent scheme, and the district court did not err in ordering him to pay restitution for the merchants' resulting losses.

AFFIRMED.