[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 02-16543

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 10, 2004
THOMAS K. KAHN
CLERK

D. C. Docket No. 00-00048-CR-3-LAC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

THOMAS L. MCCRIMMON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(March 10, 2004)**

Before TJOFLAT, HULL and FAY, Circuit Judges.

PER CURIAM:

Defendant Thomas McCrimmon challenges the district court's denial of his motion for judgment of acquittal following his first trial on charges that he conspired to enlist investors into an illegal Ponzi scheme and conspired to launder the proceeds of that scheme. McCrimmon also appeals his conviction in the second trial on these same charges and, with respect to his sentencing, asserts that the sentencing court misapplied the guidelines in determining that he was responsible for the total amount of money laundered by all of the conspirators. We affirm McCrimmon's conviction in all respects and specifically find that there was sufficient evidence presented by the government in the first trial and second trial with which a reasonable juror could infer that McCrimmon knew the program into which he was enrolling investors was an illegal Ponzi scheme. AFFIRMED.

I.

Defendant Thomas McCrimmon and four codefendants were charged in a two-count, Fourth Superseding Indictment with conspiring to commit wire and securities fraud and conspiring to commit money laundering.[1] McCrimmon proceeded to trial on the charges with codefendant William Leon Hurst. In the first trial, held between May 20 and June 6, 2002, the jury was unable to reach a verdict. Following the trial, McCrimmon and codefendant Hurst moved the district

---

[1]Seven co-conspirators named throughout the preceding indictments had either pled guilty or were convicted of these counts prior to the filing of the Fourth Superseding Indictment.

2

court for judgment of acquittal. The court granted Hurst's motion but denied McCrimmon's. McCrimmon was tried alone in July 2002 under the Fifth Superseding Indictment, which was virtually identical to the Fourth. He was convicted of both counts as charged and received a 60-month sentence on Count One and a 79-month sentence on Count Two, to run concurrently. McCrimmon was also ordered to pay $23 million in restitution.

McCrimmon's conviction stems from his involvement in a complex high-yield trading scheme known as the Hammersmith program. Hammersmith, masterminded by an entrepreneurial-type named David Gilliland, at first blush appeared to be an exclusive investor's club that was designed to yield high returns only for the lucky few that could pony up the minimum investment dollars. In late 1997, Gilliland opened a Hammersmith investment "branch" known as Bridgeport Alliance in the high-end community of Bluewater Bay, Florida. Bridgeport's objective was to serve as an administrative office for Hammersmith, but the office was also staffed with company men (including, at times, Gilliland himself) responsible for marketing the program to unwitting investors under the ruse that, with $250,000, they could buy their way into this exotic scheme.

The key selling point of the Hammersmith program was the apparent "security" of the investment, as it was supposedly collateralized in a U.S. Treasury

Bill. Investors were told that, once purchased, the Treasury Bill would be leveraged in investments such as the European currency market to generate high returns for little risk. Unfortunately for everyone involved, Hammersmith was not an investment program at all, but instead an illegal Ponzi scheme. Investors' principle was simply shuffled through various bank accounts, paid out to other investors as interest payments, and ultimately accumulated in the pockets of Gilliland and his crew. All together, Gilliland extracted over $60 million from investors across the United States by the time the program collapsed in early 1999.

McCrimmon's involvement in the scheme was that of a sales agent. Through his Tampa company Chatham International, McCrimmon began referring clients to the Hammersmith program in mid-1997. From the spring of 1997 through the summer of 1998, McCrimmon – representing that he had expertise with respect to programs like Hammersmith and the Hammersmith program particularly – recruited several investors, generating over $2 million in commissions for him and his company as a result.

## II.

Sufficiency of the evidence is reviewed by this Court *de novo*. *United States v. Majors*, 196 F.3d 1206, 1210 (11th Cir. 1999). On review, this Court views the evidence in the light most favorable to the government, making all reasonable

inferences and credibility choices in the government's favor to determine whether a rational jury could have found the defendant guilty beyond a reasonable doubt. *United States v. Petrie*, 350 F.3d 1137, 1142 (11th Cir. 2003). "The verdict must stand ... 'unless no trier of fact could have found guilt beyond a reasonable doubt.'" *United States v. Calderon*, 127 F.3d 1314, 1324 (11th Cir. 1997).

Although findings as to the amount of loss from a money laundering offense are reviewed for clear error, whether the district court misapplied U.S.S.G. § 1B1.3 is a purely legal question that we review *de novo*. *United States v. Mullens*, 65 F.3d 1560, 1563 (11th Cir. 1995); *United States v. Reese*, 67 F.3d 902, 908 (11th Cir. 1995).

## III.

The central theme of the government's argument, both during the first trial, the second trial, and now here on appeal, is that McCrimmon's perpetuation of the conspiracy manifested itself in a pattern of misrepresentations to potential clients that the Hammersmith program was working like clockwork and that his other clients were pleased with their returns, even though he knew that most of his investors were not getting paid monthly as promised, and were often paid short if they did receive a payment. Throughout the first trial, the government put on testimony from investors who lamented that the program never consistently

produced the 30 to 40 percent monthly returns they were guaranteed. Through the testimony of McCrimmon's recruits, including Dr. Arun Dosaj, Arthur Magsamen, Thomas Spear, John Graden, Claudio Antonini and A.J. Glenn, the government painted a picture of McCrimmon's aggressive efforts to continue placing new investors into the program while his own clients failed to receive timely payments.

Some significant evidence included investor Art Magsamen's testimony that he was told by McCrimmon in late 1997 that the program was very successful although, at the time, Hammersmith was already behind, and short, on payments to McCrimmon's first client, Leon Hurst. In early 1998, when at least five of McCrimmon's clients' payments had fallen late or were short, investor Claudio Antonini testified that he was told by McCrimmon that the "program was working like clockwork" and that the "investors were getting paid regularly," convincing Antonini to invest in April 1998.

· Investor John Graden testified that he was told by McCrimmon in January 1998 that McCrimmon's other clients were very happy with the program, enticing Graden to invest $300,000. Dr. Arun Dosaj testified that he also invested in Hammersmith in April 1998 based upon McCrimmon's recommendation that it was a "successful program." By this time, several of McCrimmon's clients had complained, either to him or directly to Bridgeport, that their payments were late

6

and short. Indeed, in this same month, an entity acting on behalf of McCrimmon's client Bithynia, sent a letter to Bridgeport, copying Chatham, which detailed an "ongoing, problematic situation," that is, that it had not received payments from Hammersmith for three months in a row.

Chatham client A.J. Glenn testified that as late as June 1998 he was recruited by McCrimmon, and McCrimmon did not indicate to him that there were any problems with the program. Mr. Magsamen also testified that in July 1998 McCrimmon was positively touting the program. Mr. Magsamen told McCrimmon, after Hammersmith had fallen behind on payments, that he was very concerned about his investment and he wanted out of the program. McCrimmon reassured him that the program was viable and the investors were getting paid, and even purchased $50,000 of Magsamen's investment to keep him in the program.

As suggested by this brief summation, the government undoubtedly put forth an extensive amount of circumstantial evidence to suggest that McCrimmon was being less-than-truthful in recruiting new investors into Hammersmith. However, equally significant testimony elicited in defense counsel's cross examination of these investors suggests that some, if not most, were indeed "happy" with their participation in Hammersmith in early- to mid-1998, the time frame in which McCrimmon brought most of his new clients into the program. For example, Mr.

Graden testified that he was pleased with the program after receiving his first payment in April 1998. Mr. Graden, in fact, actually received enough payments throughout mid-1998 that put him over his initial investment. Mr. Glenn, though he too received payments that were both late and short, suggested that he was also content with the program, and admitted that "everything was on track," as late as September 1998. Dr. Dosaj and Mr. Magsamen both testified that they actually reinvested their "interest payments" into the program in mid-1998.

As such, this Court is not convinced that this evidence, taken alone, permits an inference that McCrimmon knew the Hammersmith program was a fraud. The fact that McCrimmon failed to be completely honest about the timeliness of payments to his clients does not, in and of itself, suggest that he knew he was recruiting investors into a Ponzi scheme.

Viewing the record in its entirety, however, two things strike us. First, we are troubled by the very nature of the Hammersmith program. The fact alone that Hammersmith was promising returns of 360 to 480 percent per year would seem difficult for anyone, let alone a broker like McCrimmon, to swallow. One would assume that, much like gambling, incredible risk would be associated with an investment promising such lofty returns. But, amazingly, Hammersmith guaranteed to generate big returns without any risk. This alone is patently absurd.

8

And, a closer look at the way in which Hammersmith intended to "secure" the investors' money reveals how nonsensical the program actually was. The Treasury Bill, the instrument that was to collateralize the initial investment, was itself supposedly leveraged into the investment program. This placed the collateral at risk, and thus jeopardized its so-called "security." One could speculate that this would be obvious even to the most unsophisticated investor. It is therefore simply impossible for this Court to imagine that a broker with McCrimmon's experience would have believed this program was legitimate.

Additionally, at the first trial the government elicited testimony that directly suggests McCrimmon might have known Hammersmith was a fraud. Kenneth Cobb, one of the main players in Hammersmith's Bridgeport office, testified that McCrimmon told him over the telephone that if he (McCrimmon) had known the Lonons – one of his clients – had a relative that was an attorney for the SEC, he (McCrimmon) would never have brought them into the program. When these facts are taken together – the inherent suspiciousness of the program itself, McCrimmon's incriminating statement to Cobb, and McCrimmon's deceitful practice of misinforming potential clients as to the actual productivity of the program to induce them to join – we find that a reasonable juror at the first trial could infer that McCrimmon did indeed know that the Hammersmith program was

a fraud. We therefore affirm the district court's denial of McCrimmon's motion for judgment of acquittal after the conclusion of the first trial.

IV.

McCrimmon's second trial consisted of much of the same evidence as the first trial, including testimony from many of the same investors. We recognize that at the second trial the government did not call Kenneth Cobb. Instead, however, the government offered ringleader David Gilliland, who testified that McCrimmon essentially knew from the beginning that the investor funds were not being invested but were being distributed to the principals of Hammersmith. On appeal, McCrimmon challenges the veracity of Gilliland, who had apparently never offered such damning testimony before. Whether Gilliland was credible or not was properly for the jury to decide. We believe that Gilliland's testimony, together with the testimony of the investors, provided sufficient evidence for a reasonable juror to conclude that McCrimmon was a knowing participant in the Hammersmith scheme. Accordingly, we affirm McCrimmon's conviction in the second trial.[2]

---

[2]We also reject McCrimmon's contention that he is entitled to a new trial because, at the second trial, the court wrongfully admitted similar act evidence and erroneously instructed the jury on willful ignorance. Gilliland's testimony that McCrimmon and William West (a principal of Bridgeport) had worked together on "other prime bank guarantees schemes" before the formation of Hammersmith was relevant and probative as to the relationship between McCrimmon and West and, more importantly, it aided in explaining the chain of events that led to the formation of Hammersmith. Accordingly, this testimony did not violate Federal Rule of Evidence 404(b). Nor was the testimony based on hearsay. Gilliland was a coconspirator, and statements by a coconspirator are admissible as non-hearsay. *United States v. Schlei*, 122 F.3d

V.

As an alternative basis for our holding with regard to the sufficiency of the evidence to support McCrimmon's conviction, we find McCrimmon's action of marketing the program in a manner that went far beyond Hammersmith's "company line" to be indicative of criminal intent. *United States v. Simon*, 839 F.2d 1461 (11th Cir. 1988). The government introduced into evidence (in both trials) a sales flier created by McCrimmon in which he promised returns of upwards of 60% for clients investing over $1 million, even though the official pitch by Hammersmith was a 30% monthly return on investment. The flier, referred to as a "summary sheet" at trial, also stated that clients would be issued security of principal by *either* Treasury Bills or bank debenture instruments and, most alarming to Hammersmith's principals, suggested that a licensed securities dealer may be involved.

In *Simon*, defendants, salespersons in a boiler room marketing operation, were convicted of participating in a scheme to enroll investors in a fraudulent oil and gas leasing scheme. *Id*. at 1462-63. Defendants challenged their convictions,

---

944, 980 (11th Cir. 1997). With respect to McCrimmon's challenge to the jury charge, we agree with the government that the evidence overwhelmingly demonstrates that the only explanation for the defendant's lack of knowledge that his clients were not being paid and that they were victims of the fraudulent scheme is that he deliberately avoided knowing the truth. We hold that the district court did not err in instructing the jury on this theory.

11

claiming that they lacked the criminal intent necessary, in essence claiming they were "innocent dupes" of the company managers. *Id*. at 1466. This Court affirmed defendants' convictions, finding that "the appellants' contention might merit consideration had they not made representations to clients that went far beyond the information supplied by the partners at Alaska Oil." *Id*. The evidence showed that although defendants were provided with a script by their supervisors, they often diverted from that script "to make wholly unfounded representations of their own." *Id*. These misrepresentations included statements by one defendant to a potential investor that she had been to Alaska and had actually seen oil "on the mountains" included in the lease, and representations that major oil concerns had already purchased the company's leases for millions of dollars. *Id*.

McCrimmon's representations in his summary sheet mirror the type of over-the-top pitches that the defendants in *Simon* engaged in. No one at Hammersmith had authorized McCrimmon to put forth this type of information, and, indeed, the principals of Bridgeport placed him on probation to attempt to rein him in. We believe that this "sell-at-all-costs" mentality employed by McCrimmon to push the Hammersmith program provides considerable support for the district court's denial of his motion for judgment of acquittal in the first trial, and the jury's finding of criminal intent in the second.

VI.

Finally, we affirm the district court's finding that the loss attributable to McCrimmon for sentencing purposes under U.S.S.G. § 1B1.3(a)(1)(B) is $51 million – the total amount of money laundered in the Hammersmith conspiracy. When determining the loss amount attributable to a particular defendant convicted of a conspiracy offense, the district court must first determine the scope of criminal activity the defendant agreed to jointly undertake, "and then consider all reasonably foreseeable acts and omissions of others in the jointly undertaken criminal activity." *United States v. Petrie*, 302 F.3d 1280, 1290 (11th Cir. 2002) (citing U.S.S.G. § 1B1.3 cmt. n. 2 (2001)). Much like the defendant-broker in *Petrie*, McCrimmon was actively involved in contacting and recruiting clients into this fraudulent scheme. According to David Gilliland's testimony in the second trial, he was involved in the scheme from nearly its inception and, most importantly, played a critical role in its success.

McCrimmon attempts to equate his role in the conspiracy with that of the defendants in *Hunter*, 323 F.3d 1314 (11th Cir. 2003) (a recent opinion from this Court) and *Studley*, 47 F.3d 569 (2d Cir. 1995) (a decision from the Second Circuit upon which the *Hunter* court relied). We find these comparisons unavailing. *Hunter* involved a counterfeit corporate check cashing ring that operated in South

13

Florida in the late 1990's. *Hunter*, 323 F.3d at 1316. The ring was composed of three "levels" of participants – two individuals at the top who were responsible for printing the counterfeit checks; three individuals that were responsible for recruiting and occasionally driving the check-cashers (called "runners") to cash the checks; and, on the bottom of the ladder, nineteen runners. Appellants in *Hunter*, who were appealing the district court's finding that the entire amount of loss could be attributed to them for sentencing purposes, were all runners. *Id*. This Court reversed defendants' sentences because the evidence failed to show that the runners had knowledge of the full scope of the ring outside of the handful of checks each had cashed – the fact alone that defendants were aware that there was a ring was itself not enough to hold them responsible for the entire amount of loss. *Id*. at 1320.

Similarly, in *Studley*, defendant was one of ten to twenty telephone salespersons on the bottom rung of a fraudulent loan telemarketing scheme. *Studley*, 47 F.3d at 571. The Second Circuit reversed the district court's finding that defendant was responsible, for sentencing purposes, for the entire amount of loss generated by the scheme, reasoning:

> The evidence proffered to date supports the conclusion
> that Studley's agreement to participate in the fraudulent
> scheme was limited to his own fraudulent activity and did
> not encompass the fraudulent activity of the other

14

representatives. His objective was to make as much money in commissions as he could. He had no interest in the success of the operation as a whole, and took no steps to further the operation beyond executing his sales.

*Id*. at 576.

McCrimmon simply cannot be compared to these defendants. The evidence shows that McCrimmon was fully aware of the objective of the conspiracy and was actively involved in recruiting investors to further the Hammersmith scheme. The scheme itself was dependent upon his success in increasing the entire pool of money that could be redistributed to investors as "interest payments," or pocketed by the other conspirators. Though he was "independent," in the sense that Chatham was not a Hammersmith-owned company like Bridgeport, his role in the conspiracy was essentially no different than principals like Kenneth Cobb. His main objective, like Cobb's, was to bring as much money to the table as possible to line everyone's pockets. Indeed, if we were to "fit" McCrimmon into one of the illustrations provided by the sentencing guidelines, he would undoubtedly fit into illustration (c)(2) of section 1B1.3:

> Defendants F and G, working together, design and execute a scheme to sell fraudulent stocks by telephone. Defendant F fraudulently obtains $20,000. Defendant G fraudulently obtains $35,000. Each is convicted of mail fraud. Defendants F and G each are accountable for the amount he personally obtained under subsection

15

(a)(1)(A). Each defendant is accountable for the amount obtained by his accomplice under subsection (a)(1)(B) because the conduct of each was in furtherance of the jointly undertaken criminal activity and was reasonably foreseeable in connection with that criminal activity.

U.S.S.G. § 1B1.3 illus. (c)(2). Though McCrimmon did not necessarily "design" the Hammersmith program, he is "Defendant F or G" in the sense that he, along with Bridgeport, concocted a method in which he could continue to put investors into the program and further the scheme. He was certainly not a low-end operative merely aware that he was participating in some sort of criminal ring – his knowledge and participation far exceeds that description. Thus the logic at work in *Hunter* and *Studley* cannot apply. Accordingly, we affirm the district court's finding that the amount of loss attributable to McCrimmon is the entire amount of loss generated by the Hammersmith conspiracy.

## VII.

For the reasons set forth above, we AFFIRM the conviction and sentence.

AFFIRMED.

16