[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 19, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-12380
Non-Argument Calendar

_____

D.C. Docket No. 04-00075-CR-TWT-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ROBERT STEWART,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(June 19, 2006)**

Before EDMONDSON, Chief Judge, MARCUS and WILSON, Circuit Judges.

PER CURIAM:

Robert Stewart appeals his 190-month total sentence, imposed pursuant to his guilty plea for his involvement in a conspiracy to commit fraud by using counterfeit checks and stolen identifications.[1] No reversible error has been shown; we affirm.

Stewart argues that, in the light of "evolving Supreme Court jurisprudence,"[2] his due process and confrontation rights were violated when the district court based its sentencing guidelines determinations on allegedly unreliable hearsay evidence.[3] But the Sixth Amendment right to confrontation is not a sentencing right. See United States v. Cantellano, 430 F.3d 1142, 1146 (11th Cir. 2005), cert. denied, 126 S.Ct. 1604 (2006). A sentencing court may rely

---

[1]Stewart pled guilty to (1) one count of conspiring with others to defraud Bank of America, SunTrust Bank, and Wachovia (f/k/a First Union Bank) (collectively, the "Banks"), in violation of 18 U.S.C. §§ 1344, 371; (2) 53 counts of defrauding and obtaining money from the Banks on specific dates for specific amounts of money, in violation of 18 U.S.C. §§ 1344, 2; and (3) 4 counts of falsely representing social security numbers to open a bank account, to lease an apartment, to manufacture a false college identification card, and to manufacture a false Virginia state drivers license and additional college identification card, all in violation of 42 U.S.C. § 408 and18 U.S.C. § 2.

Stewart also pled guilty to a different indictment alleging (1) that he made a false claim to the U.S. Department of Veterans Affairs by stating that he had received an honorable discharge when he actually had received a bad conduct discharge, in violation of 18 U.S.C. § 287, and (2) that he had submitted a false loan application, in violation of 18 U.S.C. § 1014. This case was consolidated for sentencing with the check fraud case.

[2]Stewart cites Apprendi v. New Jersey, 120 S.Ct. 2348 (2000), Blakely v. Washington, 124 S.Ct. 2531 (2004), United States v. Booker, 125 S.Ct. 738 (2005), and Crawford v. Washington, 124 S.Ct. 1354 (2004).

[3]We review issues about the constitutionality of a sentence de novo. United States v. Chau, 426 F.3d 1318, 1321 (11th Cir.2005).

on hearsay evidence "provided that the evidence has sufficient indicia of reliability, the court makes explicit findings of fact as to credibility, and the defendant has an opportunity to rebut the evidence." United States v. Baker, 432 F.3d 1189, 1253 (11th Cir. 2005) (citation omitted), cert. denied, No. 05-9687 (U.S. Apr. 17, 2006); see U.S.S.G. §6A1.3(a); see also United States v. Giltner, 889 F.2d 1004, 1007 (11th Cir. 1989) (writing that due process at sentencing requires that defendant be allowed to refute hearsay testimony and that hearsay bear minimal indicia of reliability). Neither Booker nor Crawford changed the rule that sentencing courts may rely on reliable hearsay evidence. See Baker, 432 F.3d at 1254 n.68.

Stewart also takes issue with the district court's determination that the hearsay evidence--the statements of codefendants Derrick Grayson, Demario Riley, and Kenneth Ross as admitted through testimony of FBI Special Agent David Riser--was reliable. We disagree.

Agent Riser testified about documentary evidence supporting the statements of the three codefendants. This evidence included: (1) a fax from Stewart's previous employer, Nextel, containing names, social security numbers, and birth dates; (2) a document related to Stewart from the Department of the Army, Fort Gordon, Georgia, listing names of Army officers later used to create fraudulent

3

identities; (3) documents showing that Stewart had used stolen identifications to produce fraudulent driver's licenses and to purchase vehicles; (4) documents showing that a stolen identification and the Nextel business name were used to initiate an account with ChoicePoint, a credit reporting company; (5) credit reports from ChoicePoint listing persons who had applied to NCS Pearson (another previous employer of Stewart) while Stewart had worked at NCS Pearson; (6) a document containing sensitive information about NCS Pearson applicants; (7) copies of checks payable to other persons that Stewart had faxed from Nextel's human resources department; (8) a rental receipt showing Stewart's rental of a vehicle as a Nextel employee, when he no longer was employed by Nextel; (9) materials used in the counterfeit check operation that were mailed to a box rented by Stewart in Lawrenceville, Georgia; (10) photographs, including Stewart's photograph, stored on a computer and used to make identifications; and (11) information showing that the vehicle Grayson was driving at the time of his arrest had been purchased by Stewart by providing false pay information and pay stubs to obtain an auto loan.

The codefendants interviewed by Agent Riser presented statements consistent with one another and with the documentary evidence. Grayson confirmed that Stewart initiated the ChoicePoint account using stolen

4

identification information and Nextel as the business name. Grayson told Agent Riser that Stewart and another employee had supplied the NCS Pearson identities. Grayson explained that he and Stewart were the leaders and organizers and that both printed checks, provided identifications, directed the operation, and split the proceeds.

Riley confirmed that Stewart was an equal partner with Grayson. Riley also stated that Stewart (1) printed checks in his presence in Florida, (2) advised him that the "specials" were his idea,[4] and (3) paid him for recruiting check cashers for the "specials." Riley and codefendant Alfred Ussery stated that Grayson and Stewart were in charge, were the organizers of the group, and provided checks and identifications.[5] Codefendant Keisha Battle, a check casher, also stated that Grayson and Stewart were partners and leaders of the operation.

---

[4] Agent Riser explained that a "special" is an uncommon type of larger-dollar counterfeit check. According to Agent Riser, after the group obtained Wachovia bank account information from Mark Gentry, a "bank insider," Stewart would change telephone numbers on bank accounts. Check cashers then would cash counterfeit checks on these accounts at a Wachovia branch. When the bank would call the telephone number on the check, Stewart or Grayson would pose as the legitimate customer and would authorize the cashing of the check.

[5] Stewart asserts that Riley's statement is particularly suspect because the district court declined the government's request to assess an obstruction-of-justice enhancement, based solely on Riley's uncorroborated statement about Stewart's alleged post-arrest communication with Riley. But this statement is not relevant to whether the district court properly relied on hearsay testimony about Riley's statement of the offense conduct, which was consistent with the statements of other codefendants.

Ross and Mark Gentry (who was a Wachovia bank employee at the time of the offenses) offered similar statements about their involvement in the operation and their relationship with Stewart. Both stated that Ross had asked Gentry if he wanted to participate in the operation by providing bank account information. When Gentry agreed, Ross provided Gentry with a fax number to which Gentry faxed the information. Both stated that Gentry had no contact with Stewart or Grayson, and that Ross only had contact with Stewart.

Our review of the record establishes sufficient indicia of reliability on the hearsay statements testified to by Agent Riser. The district court, further, made an explicit determination on the reliability of the codefendants' statements.[6] And Stewart was given the opportunity to cross-examine Agent Riser about these statements.

---

[6]In ruling on an aggravating role enhancement, the district court said these things:

> [Tthere is abundant testimony from the codefendants Grayson and Riley and Ross from their statements that . . . Stewart and Grayson were more or less equal partners in this conspiracy and that they were organizers and leaders of the criminal activity. I find their testimony corroborated by the documentary evidence that Mr. Stewart participated in the printing of checks, creation of I.D.'s, directing of check chasers, coordination of drivers, recruiting Ross, who recruited Gentry, which gave him access to the insider bank information. He participated in changing the phone numbers in the internal bank accounts, which allowed the conspirators to cash the larger checks known as specials. He provided maps and other directions to the drivers so the check cashers could go to the right banks to cash the counterfeit checks. And he organized the--at least one of the out-of-town trips.

We next reject Stewart's argument that the district court violated his Sixth Amendment rights under United States v. Booker, 125 S.Ct. 738 (2005), by applying the advisory Sentencing Guidelines as effectively mandatory.[7] The district court, correctly, did consider the guidelines as "an important factor." See Booker, 125 S.Ct. at 767. And in imposing a sentence in the middle of the guideline range, the court also specifically referred to the sentencing factors set out in 18 U.S.C. § 3553(a). See United States v. Crawford, 407 F.3d 1174, 1178-79 (11th Cir. 2005) (after district court makes accurate guidelines calculation, and considers other factors set forth in18 U.S.C. § 3553(a), it may impose more severe or more lenient sentence as long as sentence is reasonable). The district court's sentencing procedure was proper under Booker.

Stewart argues the district court clearly erred in its sentencing calculations. Stewart specifically challenges (1) the four-level enhancement for being a leader or organizer, U.S.S.G. § 3B1.1(a); (2) the amount of loss attributable to him as relevant conduct, § 2B1.1(b)(1)(I); (3) the two-level enhancement for ten or more victims, § 2B1.1(b)(2)(A); (4) the two-level enhancements for use of sophisticated means, § 2B1.1(b)(9)(C), and for unauthorized use of means of identification,

_____

[7]Stewart timely raised his Booker claim below: we review his sentence de novo, but we reverse only for harmful error. United States v. Paz, 405 F.3d 946, 948 (11th Cir. 2005).

§ 2B1.1(b)(10)(C)(i); and (5) the denial of an acceptance-of-responsibility reduction, § 3E1.1. After careful review of Stewart's arguments and of the record, we reject his challenges and uphold the district court's sentencing calculations.[8] We discuss in more detail only the leadership enhancement and the loss determination.

On the leadership enhancement, documentary evidence and codefendant statements showed that Grayson and Stewart, as partners, (1) printed checks and identifications; (2) provided checks and identifications for drivers to give to check cashers; (3) instructed drivers on which bank branch to use; (3) planned out-of-town check cashing trips; (4) arranged for the "specials"; and (5) addressed problems that would arise, such as the arrest of a check casher. This evidence is enough to support the role enhancement.

About the loss calculation, Stewart cites to United States v. Hunter, 323 F.3d 1314 (11th Cir. 2003), and argues that the government failed to show (1) the scope of the conspiracy and (2) that the loss was reasonably foreseeable to Stewart. In Hunter, we wrote that the participants in a conspiracy knew that they were part of a larger criminal scheme was, by itself, insufficient to hold them

---

[8]We review the district court's fact determinations for clear error and its application of the sentencing guidelines to those facts de novo. See Crawford, 407 F.3d at 1177-78.

responsible for the entire amount of loss caused by the scheme. Hunter, 323 F.3d at 1320-21. But we think this case is more like United States v. McCrimmon, 362 F.3d 725 (11th Cir. 2004), where we concluded that the entire loss caused by a money laundering scheme properly was attributed to the defendant because he "was fully aware of the objective of the conspiracy and was actively involved in recruiting investors to further the . . . scheme." McCrimmon, 362 F.3d at 732. Unlike Hunter, Stewart was a leader and had knowledge of the full scope of the conspiracy: the conduct of his co-conspirators in furtherance of the conspiracy was reasonably foreseeable to him. The district court did not err in holding Stewart responsible for the full amount of loss caused by the conspiracy.[9]

Stewart also argues that the district court erred by using a preponderance of the evidence standard of proof when applying the guideline enhancements. He contends that a higher standard of proof should apply to his case because the enhancements--based on facts not alleged in the indictment or admitted by him-- impacted his sentence in a severe manner. But "it is the settled law of this circuit that at sentencing, a federal defendant's due process rights are . . . satisfied by the

---

[9]Stewart also contends that the district court failed to explain its ruling on this issue. The record overwhelmingly supports the district court's loss determination: the court's failure to make a particular finding on the scope of Stewart's activity is not a basis for vacating his sentence. See United States v. Petrie, 302 F.3d 1280, 1290 (11th Cir. 2002).

9

preponderance of the evidence standard." <u>United States v. Jackson</u>, 57 F.3d 1012, 1019 (11th Cir. 1995) (citations omitted); <u>see also</u> <u>United States v. Rodriguez</u>, 398 F.3d 1291, 1296 (11th Cir.), <u>cert. denied</u>, 125 S.Ct. 2935 (2005) (applying preponderance standard after <u>Booker</u>).

In sum, we discern no error in Stewart's sentence.

AFFIRMED.