[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-14431
Non-Argument Calendar

_____

D.C. Docket No. 2:11-cr-14025-KMM-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

INUKA RHAHEED,

Defendant-Appellant.


_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(February 27, 2013)

Before WILSON, PRYOR and ANDERSON, Circuit Judges.

PER CURIAM:

Inuka Rhaheed appeals his sentence of 78 months of imprisonment for one

count of conspiring to defraud the Internal Revenue Service, 18 U.S.C. § 371, and

two counts of aiding and assisting in the filing of a fraudulent income tax return, 26 U.S.C. § 7206(2).  Rhaheed argues that his sentence is procedurally unreasonable because the district court erred in calculating the amount of tax loss. Rhaheed argues that the district court erroneously based its calculation on unreliable hearsay testimony about uncharged offenses, which violated his right of confrontation under the Sixth Amendment.  We affirm.

Rhaheed and his wife owned First Premium Financial Services, an income tax preparation business.  Rhaheed was a former police detective and developed a clientele of law enforcement officers.  Between tax years 2006 and 2008, First Premium obtained refunds for 98 percent of its clients through tax returns prepared by Rhaheed, his wife, and their eight employees.  The rate of refunds collected by clients of First Premium far exceeded the national average of 50 percent.

The Service investigated First Premium and discovered that it prepared tax returns containing, unbeknownst to its clients, fabricated deductions.  The Service learned that First Premium profited handsomely from its fraud through charging additional fees for the separate tax schedules required to claim the bogus deductions.  And the Service learned that Rhaheed provided his employees an incentive to commit fraud: Rhaheed paid his employees thirty percent of the fee charged for the returns they prepared, while Rhaheed and his wife retained the remainder of the fee.  The Service also learned that Rhaheed trained his employees

2

how to prepare tax returns; provided checklists of expenses to claim on tax returns; and supervised and assisted in the preparation of fraudulent tax returns.

During Rhaheed's trial, the United States introduced testimony from federal agents and from employees and clients of First Premium. Agent Mark Nirenberg testified about supervising two undercover agents who had tax returns prepared by Rhaheed and by one of his employees that sought refunds based on bogus deductions. One of the undercover agents testified that, during his consultation, Rhaheed applied a bogus charitable deduction for the stated reason of "keep[ing] [the agent] from owing," and said, "[w]ell, we look out for you," in response to the agent's remark about expecting to owe federal income taxes. Rhaheed's employee, Alice Simpson, testified about the division of profits at First Premium; Rhaheed's role in the business; and how Rhaheed supervised the preparation of tax returns. Nine clients of First Premium identified bogus deductions on their tax returns, and seven of those clients testified about receiving refunds ranging from $5,004 to $13,249. And Stanley Lottman, an auditor for the Service, testified that the fraudulent tax returns prepared for the seven clients resulted in a tax loss of $87,284. Lottman explained how he determined the amount of tax loss after adjusting the tax returns for the bogus deductions identified by the clients during their interviews with federal agents. Lottman testified that he reviewed

3

approximately 40 fraudulent tax returns filed by First Premium, and those returns resulted in a tax loss of more than $500,000, but less than $1 million.

Rhaheed's presentence investigation report grouped his offenses and provided a base offense level of 20 based on a tax loss of $727,729. United States Sentencing Guidelines Manual § 2T4.1(H) (Nov. 2010). The report increased Rhaheed's base offense level by two points because he was in the business of preparing or assisting in the preparation of tax returns, id. § 2T1.4(b)(1)(B), and by four points because he was an organizer or leader of the criminal activity, see id. § 3B1.1(a). With an adjusted offense level of 26 and a criminal history of I, the report provided an advisory guideline range between 63 and 78 months of imprisonment.

Rhaheed objected to the amount of tax loss and the enhancement of his sentence for being an organizer of the conspiracy. The district court rejected Rhaheed's objection to the enhancement for his role based on the evidence at trial that he "was in the principal role as the organizer of the criminal activity." When Rhaheed argued that the tax loss was limited to $87,284 and that evidence about other taxpayers was inadmissible hearsay that violated his right of confrontation, the prosecutor offered to substantiate the loss amount with evidence of Rhaheed's relevant conduct.

4

The United States introduced evidence that Rhaheed caused a tax loss of more than $700,000.  Agent Nirenberg testified about interviewing 36 clients of First Premium who identified bogus deductions on their tax returns and about providing the clients' statements to Agent Lottman to audit the corresponding tax returns.  On cross-examination, Nirenberg testified that he did not advise the clients of their rights before the interviews; did not advise them that they were potential suspects; and told them that they were witnesses.  Nirenberg also testified that the clients could have been prosecuted had they included false information in their tax returns and all the clients had signed a statement confirming the accuracy of their tax returns.  After the prosecutor stated that ten of the 36 clients "plus or minus two" testified at Rhaheed's trial, the district court overruled Rhaheed's objections regarding hearsay and the violation of his right of confrontation.  The district court found that Nirenberg's testimony bore "an indicia of reliability . . . that . . . justif[ied] relying on [his] testimony as opposed to dragging in those other 26 witnesses."  The district court based its decision on the clients' testimony at trial; the "summary . . . [that] the approximately 26 other witnesses" would testify similarly about their tax returns containing bogus deductions; and the circumstances in which the clients spoke to Nirenberg.

Agent Lottman testified about calculating Rhaheed's tax loss.  Lottman testified that he received 76 tax returns filed by 36 clients of First Premium; he

5

compared the tax returns with the clients' interviews; and he adjusted the tax returns to reflect the clients' actual tax liabilities. And Lottman provided to the district court a schedule of the tax loss attributable to each client. Lottman testified that there was a "strong possibility" that the tax loss exceeded his calculation and he was certain that the tax loss was between $400,000 and $1 million. At the conclusion of Lottman's testimony, Rhaheed's attorney verified that he had reviewed the tax returns prepared for the clients who did not testify at trial and that he "could have had [his] own outside tax expert do the computations on the basis of the disallowed deductions."

"[S]atisfied that the Probation Officer correctly calculated the loss as $727,729," the district court sentenced Rhaheed at the high end of the advisory guideline range. The district court found that Rhaheed's crime was "serious" and that he had "denied [taxpayers] and the Treasury the opportunity" to use the lost tax revenues for "Social Security payments, Medicare payments, Medicaid payments, and other payments that benefit us all as a society." Rhaheed "object[ed] to the Court's finding as to the amount of tax loss" and the "finding of the four-level role enhancement," and Rhaheed argued that his "sentence [was] procedurally and substantively unreasonable."

The district court did not err in calculating the tax loss attributable to Rhaheed. "Tax loss" is "the total amount of loss that was the object of the

6

offense," U.S.S.G. § 2T1.1(c)(1), and includes "all conduct violating the tax laws . . . [that is] part of the same course of conduct or common scheme or plan," id. at cmt. n.2.  The district court did not clearly err in finding that Rhaheed was responsible for the tax loss attributable to all 36 clients of First Premium, even though some of the tax returns did not list Rhaheed as the paid preparer.  A defendant's relevant conduct includes "all acts and omissions . . . [that he] aid[s], abet[s], counsel[s], command[s], [or] induce[s]" and "all reasonably foreseeable acts and omissions of otherwise in furtherance of []a jointly undertaken criminal activity."  Id. § 1B1.3(a).  Rhaheed prepared and assisted in the preparation of false tax returns, and he knew, or at the least reasonably could have foreseen from the training he provided and the incentives he awarded, that the tax returns prepared by his employees contained false deductions.  See United States v. McCrimmon, 362 F.3d 725, 731 (11th Cir. 2004); see also U.S.S.G. § 1B1.3 cmt. n.2.  Rhaheed argues that the district court should not have relied on hearsay testimony from Agent Nirenberg that approximately 26 other clients identified bogus deductions in their tax returns, but Nirenberg's testimony bore "sufficient indicia of reliability" to be considered at sentencing.  United States v. Ghertler, 605 F.3d 1256, 1269–70 (11th Cir. 2010).  Nirenberg interviewed the 26 clients and their accounts were consistent with the trial testimony of undercover agents and nine clients of First Premium that Rhaheed had prepared or assisted in the preparation of tax returns

7

containing deductions that he knew were bogus.  Although Rhaheed argues that admission of the hearsay testimony violated his right of confrontation, he acknowledges that his argument is foreclosed by precedent.  See United States v. Cantellano, 430 F.3d 1142, 1146 (11th Cir. 2005); United States v. Chau, 426 F.3d 1318, 1323 (11th Cir. 2005).

We **AFFIRM** Rhaheed's sentence.