[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-10820
Non-Argument Calendar

_____

D.C. Docket No. 8:15-cr-00173-SDM-MAP-6

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LAZARO VELAZQUEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(January 19, 2017)

Before MARTIN, JORDAN, and ROSENBAUM, Circuit Judges.

PER CURIAM:

Lazaro Velazquez appeals the 21-month sentence he received after he

pleaded guilty to conspiracy to commit bank fraud and to substantive bank fraud.

Velazquez's role in the conspiracy was to deposit stolen money orders in his bank

accounts, cash those stolen money orders, and return most of that cash to the two leaders of the conspiracy.[1] The leaders paid him as much as fifty or sixty dollars per money order.

After a conversation about financial struggles, Velazquez introduced Yensy Guevara to Juan Carlos Miranda-Noda, who was one of the leaders of the conspiracy. Velazquez accompanied them on Guevara's first trip to deposit and cash a money order. He later had discussions with her about opening more bank accounts to cash more money orders and about police interaction. At Velazquez's sentencing, the district court calculated the guideline enhancement for loss by including both the money Velazquez deposited and that deposited by Guevara. Velazquez argues on appeal that the district court erred by attributing Guevara's losses to him. After careful review, we affirm.

## I.

Velazquez pleaded guilty to one count of conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349, and nineteen counts of substantive bank fraud, in violation of 18 U.S.C. §§ 1344 and 2. His guilty plea did not include a written plea agreement. Instead, Velazquez and the government stipulated to facts in Velasquez's sentencing memorandum, as well as to the facts set out in the

---

[1] We refer to the two people in the conspiracy who stole the money orders and received most of the stolen money as the "leaders." This does not reflect a role determination made at sentencing.

Presentence Investigation Report ("PSR").  At Velazquez's sentencing hearing, the government presented the testimony of Special Agent Manny Fernandez who served as a translator during Guevara's interview at the U.S. Attorney's Office.

The details of the conspiracy were as follows:  The two leaders of the conspiracy burglarized rent-payment drop boxes in apartment complexes.  In total, they stole $430,860 in money orders from more than 250 tenants throughout Florida and Georgia.  They then "washed" the names on the "pay to" line of the money orders and either deposited the money orders into their bank accounts or gave them to Velazquez or other coconspirators to deposit.  When Velazquez deposited a money order, he would withdraw the cash, keep a small portion for himself, and return the rest to the leaders of the conspiracy.  During his time in the conspiracy, Velazquez deposited seventy-two money orders totaling $39,475 into his three bank accounts.

While involved in the conspiracy, Velazquez had a conversation with Guevara, his coworker, about her financial struggles.  Velazquez then told Guevara about the scheme to cash money orders in return for as much as fifty or sixty dollars per money order.  Velazquez introduced Guevara to Miranda-Noda and accompanied them the first time Guevara deposited a stolen money order.  Some time later, Velazquez advised Guevara to open more bank accounts.  Miranda-Noda gave her the same advice, and she then opened three new accounts.  Agent

3

Fernandez testified that Guevara mentioned a conversation with Velazquez toward the end of the conspiracy about their interactions with police.  During cross-examination, both parties agreed that Guevara originally gave law enforcement a false story.  During her time in the conspiracy, Guevara deposited 143 money orders totaling $76,593 into her bank accounts.

The PSR recommended Velazquez be held accountable only for the $39,475 that he deposited.  This resulted in a recommended 4-level enhancement for a loss between $15,000 and $40,000 under United States Sentencing Guidelines § 2B1.1(b)(1)(C).  After all adjustments, the PSR recommended a total offense level of 13 along with a criminal history category of I, resulting in a recommended guideline imprisonment range of 12 to 18 months for Velazquez.

The government objected to the PSR's loss calculation.  It argued Velazquez should be sentenced either for the full amount of loss in the conspiracy, or for both the amount he deposited and the amount Guevara deposited.  The district court overruled the objection that Velazquez should be sentenced to the full amount of loss in the conspiracy.  But it granted the government's alternative argument that the money Guevara deposited should be added to the money Velazquez deposited for a total loss amount of $116,068.  The district court applied an 8-level enhancement for a loss between $95,000 and $150,000 under Guidelines

4

§ 2B1.1(b)(1)(E), which (after adjustments) resulted in a total offense level of 16[2] and a guideline imprisonment range of 21 to 27 months. The district court sentenced Velazquez to 21-months imprisonment.[3]

In accepting the government's alternative argument, the district court found Velazquez implicitly agreed to a joint undertaking with Miranda-Noda in which Velazquez would recruit Guevara. The court continued: "So Mr. Velazquez's recruitment and the introduction of the recruit into the purpose, operation, and means of the conspiracy, that is the pattern of the conspiratorial enterprise, was jointly undertaken criminal activity or I guess more precise it was within the scope of their jointly undertaken criminal activity." The district court said the enlargement of the conspiracy furthered the conspiracy's objectives, including an attempt to avoid the consequences as law enforcement closed in on the conspiracy. It further found Guevara's deposits were "readily foreseeable." The district court summarized that Velazquez understood and instigated Guevara's activities in the conspiracy, the conspiracy benefited from those activities, and Velazquez benefited from those activities "if not directly in terms of cash . . . at least in terms of the aggregate proceeds [and] the vitality and life and progress of the conspiracy."

---

[2] The 8-level enhancement for loss allowed for a 3-level, rather than a 2-level, decrease for acceptance of responsibility. See USSG § 3E1.1. The total offense level therefore rose by only 3 levels.

[3] The district court also ordered Velazquez to pay restitution for the amounts he and Guevara deposited.

Thus, the district found Velazquez responsible for Guevara's activity and added $76,593 to the loss calculation.

## II.

We review <u>de novo</u> whether the district court misapplied Guidelines § 1B1.3. <u>United States v. McCrimmon</u>, 362 F.3d 725, 728 (11th Cir. 2004) (per curiam). But a district court's findings as to the amount of loss are reviewed for clear error. <u>Id.</u> at 728.

Guidelines § 1B1.3(a)(1) says, in relevant part, that specific offense characteristics such as loss calculation shall be determined from:

> (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—
>
>> (i) within the scope of the jointly undertaken criminal activity,
>>
>> (ii) in furtherance of that criminal activity, and
>>
>> (iii) reasonably foreseeable in connection with that criminal activity . . . .

<u>Id.</u>; <u>see also</u> <u>id.</u> § 2B1.1(b)(1)(listing the enhancements for each loss amount). It's clear that the deposits Velazquez made personally should count toward his enhancement for loss. <u>See</u> <u>id.</u> § 1B1.3(a)(1)(A). However, Velazquez argues the district court misapplied § 1B1.3(a)(1) by enhancing his sentence for Guevara's deposits as well. Velazquez specifically argues Guevara's deposits were not

6

within the scope of Velazquez's jointly undertaken criminal activity.  See id.
§ 1B1.3(a)(1)(B)(i).

The commentary to Guidelines § 1B1.3 provides guidance for evaluating whether a defendant should be held accountable for the conduct of others.[4]  See USSG § 1B1.3 cmt. nn.3–4.  Application Note Three explains that a court "must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake."  Id. at n.3(B).  "In doing so, the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others."  Id.  But the defendant's accountability "for the acts of others is limited by the scope of his or her agreement."  Id.  Thus, an act of another outside the scope of the defendant's agreement, no matter how reasonably foreseeable, is not attributable to the defendant.  See id.; Reese, 67 F.3d at 906–07.

Velazquez and the government did not dispute the facts of his case at sentencing.  What they did and continue to dispute is whether those facts imply an agreement to expand the scope of Velazquez's criminal activity.  The district court found it "clear" that Velazquez and Miranda-Noda had an implicit agreement to recruit Guevara.  Velazquez points to our precedent in United States v. Hunter, 323 F.3d 1314 (11th Cir. 2003), in response.

---

[4] "The commentary of section 1B1.3, and its examples, are binding on this court." United States v. Reese, 67 F.3d 902, 908 (11th Cir. 1995).

7

The district court in Hunter held check cashers similar to Velazquez responsible for the total actual loss of the conspiracy because it was reasonably foreseeable they were participating in a larger scheme.  323 F.3d at 1318.  On appeal, this Court held "that the district court misapplied U.S.S.G. § 1B1.3 by failing to make particularized findings as to the scope of criminal activity undertaken by each [check casher]."  Id. at 1316.  In other words, we vacated the defendants' sentences because the district court skipped the first step of determining the scope of the jointly undertaken criminal activity and only analyzed reasonable foreseeability.  Id. at 1320 (citing USSG § 1B1.3 cmt. n.3(B)).

Because application of the Guidelines was at issue, we performed a de novo review in Hunter.  See Reese, 67 F.3d at 908–909.  Here, however, the district court did not skip any steps in the legal analysis, and made the factual finding that Velazquez implicitly entered into an agreement to expand the scope of his jointly undertaken criminal activity.  Thus, we review the district court's decision under the deferential clear error standard.  United States v. Barrington, 648 F.3d 1178, 1195 (11th Cir. 2011).  "A factual finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  Id. (quotation omitted).

8

The government points out that Velazquez recruited Guevara, introduced her to Miranda-Noda, accompanied her on her first deposit, encouraged her to open more bank accounts for depositing more money orders, and discussed police interaction with her.  Velazquez argues he took no part in "designing and executing the scheme," see Hunter, 323 F.3d at 1321, and acted independently of Guevara outside of these interactions.  Whether these interactions implied an agreement to enlarge the scope of his jointly undertaken criminal activity is a close call.  Thus, we defer to the judgment of the district court, which did not clearly err by inferring an agreement between Velazquez and Miranda-Noda from these facts.[5]

**AFFIRMED**

---

[5] Velazquez also argues the district court's sentence was procedurally unreasonable because other codefendants with different roles were not also held responsible for the losses of their coconspirators.  But "disparity between the sentences imposed on codefendants is generally not an appropriate basis for relief on appeal."  United States v. Cavallo, 790 F.3d 1202, 1237 (11th Cir. 2015) (quotation omitted and alteration adopted).

9