[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-15608
Non-Argument Calendar

_____

D.C. Docket No. 9:17-cr-80080-BB-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

STEPHANE CINDY ANOR,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(February 26, 2019)

Before ROSENBAUM, NEWSOM, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Stephanie Anor challenges her 36-month sentence of imprisonment for

conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349.  In

calculating Anor's guideline range, the district court applied an 18-level enhancement based on its finding that the intended loss of the conspiracy in which she knowingly participated was $3,796,317. *See* U.S.S.G. § 2B1.1(b)(1). Anor argues on appeal that the court erred in holding her accountable for losses outside of her individual conduct. After careful review, we vacate and remand for resentencing.

## I.

A federal grand jury returned a 38-count indictment charging Corry Pearson and Anor for their roles in an income-tax-fraud scheme being operated at Tax King in West Palm Beach, Florida. According to the indictment, Pearson, the owner of Tax King, and Anor, a Tax King employee, prepared and filed hundreds of false and fraudulent federal income-tax returns in 2013 and 2014. Some of these returns used the personally identifiable information of identity-theft victims.

The indictment charged both Pearson and Anor with one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349; nine counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; and five counts of aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1) and 2. Pearson was charged with an additional twelve counts of wire fraud, an additional six counts of aggravated identify theft, and five counts of money laundering.

2

Anor pled guilty to the conspiracy count under a written plea agreement, and the remaining counts were dismissed at sentencing. Pearson denied guilt and proceeded to trial, and a jury found him guilty of all but two counts.

A probation officer prepared Anor's presentence investigation report ("PSR"), which recommended a total offense level of 22, a criminal-history category of I, and a resulting guideline range of 41 to 51 months of imprisonment. The probation officer recommended that the district court apply—among other guideline provisions, including a minor-role reduction—an 18-level enhancement under U.S.S.G. § 2B1.1(b)(1)(J) based on an intended loss of at least $3,500,000 but less than $9,500,000.

In calculating the loss amount of $3,796,317, the probation officer held Anor responsible for all intended loss—the amount fraudulently claimed as tax refunds—associated with Tax King's West Palm Beach office, where Anor worked as an employee.[1] All returns filed by that office could be identified by a specific Electronic Filing Identification Number ("EFIN"), which was linked to the office's physical address. According to the PSR, during 2013 and 2014, the West Palm Beach office filed more than 1,500 tax returns, claiming $3,796,317 in refunds based on false information or identity theft. Of these returns, 92 listed Anor's Preparer

---

[1] The conspiracy extended beyond the West Palm Beach office, though Anor was not held responsible for any of that additional conduct.

3

Tax Identification Number ("PTIN") as the tax return preparer. The intended loss associated with the returns Anor prepared was approximately $385,000.

The PSR describes an interview with Anor in connection with the execution of a search warrant at the West Palm Beach office. Anor told IRS agents the following. She started preparing tax returns for Pearson in 2013. Pearson had a lot of clients, and he sometimes gave her an index card with a person's identification information and figures for the return. She never met the people on the index cards. Pearson made up the figures to get clients more money back as a refund. Anor would "play with the numbers, but not too much to cause a red flag," including applying credits to returns even where the customers did not incur the expenses. She confirmed putting "false figures" on tax returns, and she stated that she followed this practice for almost every client for the 2014 tax season (tax year 2013). She knew that Pearson employed four other tax preparers in the same office in 2013, though she knew only two of their names. She and Pearson were the only ones in the office in 2014.

Anor objected to the PSR's loss-amount calculation. Without objecting to any specific facts in the PSR, Anor asserted that the loss amount should be between $250,000 and $550,000, which reflected the pecuniary harm that "Anor knew or, under the circumstances, reasonabl[y] should have known, was a potential result of the offense." A loss amount in that range, according to Anor, would yield a 12-level

enhancement, U.S.S.G. § 2B1.1(b)(1)(G), a total offense level of 22, and a resulting guideline range of 21 to 27 months.

At sentencing, the parties offered their respective views on the correct loss amount. Anor maintained that she should be held responsible for only the returns she personally prepared. The government responded that Anor was responsible for all reasonably foreseeable acts by others in furtherance of the jointly undertaken criminal activity and that her own admissions adequately established her knowledge that she was participating in a larger fraud.

The district court overruled Anor's objection. The court noted that a defendant's relevant conduct for sentencing includes "all reasonably foreseeable acts and omissions by others in furtherance of the jointly undertaken criminal activity, in this case, the conspiracy to which you entered a plea of guilty." The court explained that it "ha[d] to find that the scope of this criminal activity was undertaken by [Anor]."

Looking to Anor's statements to the IRS, the district court found "dispositive" her admission that she would play with the numbers—knowing that the claimed amounts were false—for almost every client for tax year 2014. The court also cited her knowledge of the four other tax preparers in 2013. Given Anor's "specific knowledge" of the conspiracy, particularly her preparation of tax returns based on false information provided by Pearson, the court found that it was reasonably

5

foreseeable to her that other false returns not prepared by her were part of the conspiracy. Accordingly, the court adopted the PSR's intended loss amount of $3,796,317 and the resulting guideline range of 41 to 51 months.

Ultimately, the district court sentenced Anor to 36 months of imprisonment, granting her a slight variance. Anor now appeals the loss calculation.

## II.

In considering challenges to guideline-application decisions, we review legal issues *de novo*, factual findings for clear error, and application of the guidelines to the facts with due deference. *United States v Rothenbus*, 610 F.3d 621, 624 (11th Cir. 2010). We review a district court's calculation of the loss amount for clear error. *United States v. Ford*, 784 F.3d 1386, 1396 (11th Cir. 2015).

A district court must support its loss determination with "reliable and specific evidence" in the record. *United States v. Gupta*, 463 F.3d 1182, 1200 (11th Cir. 2006). The court may rely on, among other things, undisputed factual statements in the PSR, which are deemed admitted for purposes of sentencing. *United States v. Wade*, 458 F.3d 1273, 1277 (11th Cir. 2007).

The guidelines define "loss" as "the greater of actual or intended loss." U.S.S.G. § 2B1.1, cmt. n.3(A) (2016). "Intended loss" is the measure in this case and is defined as "the pecuniary harm that the defendant purposely sought to inflict." *Id.* at n.3(A)(ii). Additionally, "a district court may hold participants in a conspiracy

6

responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy." *United States v. Mateos*, 623 F.3d 1350, 1370 (11th Cir. 2010) (quotation marks omitted).

However, "[t]he limits of sentencing accountability are not coextensive with the scope of criminal liability." *United States v. Hunter*, 323 F.3d 1314, 1319 (11th Cir. 2003). Under the guidelines, liability for the reasonably foreseeable acts of others is limited by the scope of the criminal activity the defendant agreed to jointly undertake. *See* U.S.S.G. § 1B1.3, cmt. n.2. Therefore, "to determine a defendant's liability for the acts of others, the district court must first make individualized findings concerning the scope of criminal activity undertaken by a particular defendant." *Hunter*, 323 F.3d at 1319 (quotation marks omitted). "In determining the scope of the criminal activity, the district court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." *United States v. Petrie*, 302 F.3d 1280, 1290 (11th Cir. 2002). Once that individualized finding is made, the court can proceed to determine reasonable foreseeability. *Hunter*, 323 F.3d at 1319.

Our decision in *Hunter* illustrates the limits of sentencing accountability for low-level defendants who are convicted of participating in a broader conspiracy. The defendants in *Hunter* were participants in a counterfeit corporate check-cashing ring that operated in South Florida. *Id.* at 1316. The ring was composed of three

7

"levels" of participants—two individuals at the top who were responsible for printing the counterfeit checks; three individuals who were responsible for recruiting and occasionally driving the check-cashers (called "runners") to cash the checks; and, at the bottom, nineteen runners. *Id.* At sentencing, the district court held the three defendants, who were runners, responsible for the total loss of the entire conspiracy, stating that the losses associated with the broader conspiracy were reasonably foreseeable to them. *Id.* at 1318.

On appeal, we held that reasonable foreseeability alone was not enough and that the district court erred by failing to "first determine the scope of the criminal activity [the defendants] agreed to jointly undertake." *Id.* at 1320 (quotation marks omitted). We explained that "the Guidelines establish that the fact that the defendant knows about the larger operation, and has agreed to perform a particular act, does not amount to acquiescence in the acts of the criminal enterprise as a whole." *Id.* Thus, the fact that the defendants cashed multiple checks, which made them responsible for those checks, did not "automatically" or "necessarily" support a finding that they knew the scale of the conspiracy, "let alone that [they] agreed to the full extent of that criminal activity." *Id.* at 1320–21. Similarly, the mere fact that one of the defendants identified other runners working for a mid-level operative was "not enough to make her accountable for their conduct" without some other evidence "from which an agreement can be inferred." *Id.* at 1320. Cautioning that

8

the defendants' "involvement and agreement in the conspiracy may be limited to the checks each actually cashed," we vacated the application of a loss enhancement and remanded for the court to make individualized findings as to the scope of criminal activity each defendant agreed to undertake. *Id.* at 1322.

*Hunter* further elaborated on the types of evidence showing agreement in a larger criminal scheme. *See id.* at 1321–22. One "relevant factor in determining whether an activity is jointly undertaken is whether the defendant assisted in designing and executing the scheme." *Id.* at 1321; *cf. United States v. McCrimmon*, 362 F.3d 725, 732–33 (11th Cir. 2004) (holding a defendant responsible for the entire amount of loss where the defendant, though he did not "design" the scheme, actively recruited investors to further the scheme and had a role equivalent to a higher-level operative). Another is "evidence of sharing or mutuality from which an agreement in the larger criminal scheme can be inferred." *Hunter*, 323 F.3d at 1322. For example, in *United States v. Hall*, we affirmed a court's determination that the defendant's relevant conduct included fraud losses caused by others in a telemarketing-type conspiracy where each of the participants knew each other and was aware of the others' activities, and they aided and abetted one another by sharing lead sheets of potential victims and sharing telephones. 996 F.2d 284, 285–86 (11th Cir. 1993).

Here, we vacate and remand because the district court failed to "first determine the scope of the criminal activity [Anor] agreed to jointly undertake." *Hunter*, 323 F.3d at 1320. While the court recognized the need to make a finding as to the scope of criminal activity to which Anor agreed, we cannot tell from the sentencing transcript that the court actually did so. Rather, the court's determination that Anor was responsible for all tax returns filed by Tax King's West Palm Beach office appears to have been based on reasonable foreseeability—that is, her knowledge that she was participating in a broader conspiracy.

However, as *Hunter* states, "the fact that the defendant knows about the larger operation, and has agreed to perform a particular act, does not amount to acquiescence in the acts of the criminal enterprise as a whole." *Id.* The record clearly reflects that Anor agreed to and is responsible for the false tax returns she herself prepared. But her accountability for those returns, like the runners' accountability for the checks they cashed in *Hunter*, "does not necessarily suggest that [Anor] knew the scale of the conspiracy of which she was a part, let alone that she agreed to the full extent of that criminal activity." *Id.* at 1321.

Likewise, the fact that Anor knew that Pearson had "a lot" of other clients is not enough to make her accountable for the tax returns filed on behalf of those clients, absent some conduct from which an agreement can be inferred with respect to them. *See id.* The government does not suggest that Anor took any action with

10

respect to tax returns she herself did not prepare. Nor does the record indicate that Anor received any of the profits from the broader scheme or that she was involved in recruiting additional clients to further the scheme, like the defendant in *McCrimmon*. Rather, the record reflects that she was hired by Pearson to do a discrete job, and that job was but a part of the overall conspiracy.

The government also notes that Anor knew that other tax preparers worked for Pearson, but, as in *Hunter*, "the mere fact that [Anor] identified other [tax preparers] working for [Pearson] is not enough to make her accountable for their conduct, unless the Government can point to some other conduct from which an agreement can be inferred." *Id.* at 1320. And we do not see anything in the PSR to suggest that Anor interacted with these other tax preparers. For instance, there is no "evidence of sharing or mutuality" with the other tax preparers, like there was with the participants of the fraud scheme in *Hall*. *See id.* at 1322.

In sum, the record establishes that Anor agreed to prepare certain tax returns containing false information for Pearson, and also knew or should have known that there was a broader conspiracy. But, under *Hunter* and the guidelines, these facts alone are not enough to show that she agreed to or acquiesced in the acts of the criminal enterprise as a whole. *See id.* at 1320.

Because the district court did not make a particularized finding regarding the scope of Anor's agreement, as required by U.S.S.G. § 1B1.3(a)(1)(B), we vacate

Anor's sentence and remand for a resentencing hearing at which that finding shall be made. If the district court determines a different loss amount based on the relevant conduct attributed to Anor at the resentencing hearing, it may also reevaluate Anor's entitlement to a minor role reduction according to the principles articulated in *United States v. De Varon,* 175 F.3d 930, 944 (11th Cir. 1999) (en banc) and any other relevant precedent.

**VACATED AND REMANDED.**