[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-14585

_____

D.C. Docket No. 1:14-cr-20008-KMM-1


UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

DOMENICO RABUFFO,
a.k.a. Dom Rabuffo,
RAYMOND E. OLIVIER,
a.k.a Ray Olivier,
MAE RABUFFO,
CURTIS ALLEN DAVIS,

Defendants - Appellants.


_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(November 20, 2017)

Before JORDAN and JILL PRYOR, Circuit Judges, and COOGLER,[*] District Judge.

PER CURIAM:

"I have never encountered anything to the magnitude of the fraud perpetrated by those related to the Hampton Springs Development. These are the largest losses by any act of fraud that I have been involved with in my entire banking career." This was the observation of Cary Mudge, a 22-year banking veteran and loan work-out specialist at SunTrust Bank, concerning the $50 million real estate fraud scheme that is the centerpiece of this appeal.

Domenico and Mae Rabuffo, Raymond Olivier, and Curtis Davis, who were convicted at trial of bank fraud and conspiracy to commit bank fraud and wire fraud for their participation in this scheme, *see* 18 U.S.C. §§ 1344 & 1349, raise a number of trial and sentencing issues. With the benefit of oral argument, and following a review of the record, we affirm the convictions and sentences.

## I.    FACTS

We begin with the facts proven by the government, and then turn to the arguments raised on appeal.

---

[*] Honorable L. Scott Coogler, United States District Judge for the Northern District of Alabama, sitting by designation.

## A

The fraudulent scheme was built from the ground up.  In 2005, Mae[1] operated as the sole owner of MAR Construction Communications, Inc., which she had incorporated in 1995.  In July of that year, she used a $1.2 million loan from Washington Mutual Bank to purchase land in North Carolina.

At one point, the funds were wired from a MAR Construction account to a law firm account in North Carolina.  To close the deal, Mae flew to North Carolina on a private jet, accompanied by a dog, a body guard, and her husband Domenico.  The Rabuffos continued purchasing property from 2005 onward, and by 2007 they had purchased a number of parcels of land in North Carolina.  This real property, in time, would become known as the Hampton Springs development.

Domenico, who ran MOD Development, began looking for investors and presented himself as a developer of a real estate opportunity.  Touting the Hampton Springs development, Domenico used a promotional brochure to recruit investors by offering them a "unique" opportunity to own property "risk free," without spending anything on costs or expenses.

Olivier operated Calcour Development, LLC, and was presented to investors as the Hampton Springs project manager who also assisted in the loan application

---

[1] Because the Rabuffos share a last name, we refer to them by their first names for sake of clarity.

3

process.  Davis, an owner of Executive Mortgage and Investments, Inc., focused on helping Domenico recruit investors for the project.

**B**

Domenico, Olivier, and Davis all told the investors essentially the same story: each investor would get a deed to a lot in the Hampton Springs development; MOD Development—the developer—would build a home on the lot; and MOD Development would sell the improved property and split the sales proceeds with the investor.  To get in on this deal, the investors had to give their names and their credit to the venture, i.e., the investors had to obtain mortgage loans in their own names and give the loan proceeds to Domenico during the "lot buying phase" of the project.

Domenico promised to pay all closing costs for the purchase of the lots, as well as a "fee" of $12,500 to each investor.  He also promised to make the payments on the investors' mortgage loans for one year, at the end of which he would "buy out" the loans and pay the investors another $12,500 fee, or give them a chance to "roll over" the mortgage loans into "construction loans," the proceeds of which would be used to pay off the existing mortgage loans and build homes on the lots.

Despite Domenico's pitch, most of the "investors" were actually straw purchasers, and many would eventually (and knowingly) submit loan applications

4

with false information designed to make them more palatable to the financial institutions providing the loans.  The investors gave their personal and employment information and bank statements to Domenico, Olivier, and Davis, who represented that the information would be used to apply for loans on their behalf. The investors then signed loan applications for hundreds of thousands of dollars of mortgage loans from Wachovia Bank, Bank of America, and Regions Bank. They also signed HUD settlement statements reflecting their purchase of property in the Hampton Springs development.

The loan applications from the straw purchasers contained false income and employment information, including inflated income figures for the borrowers.  For example, HUD settlement statements contained false statements by the borrowers that they had paid all the closing costs for the properties and had made substantial down payments for the properties into the escrow account of the closing agent, a law firm by the name of Pavey & Smith.  Although they had not paid any out-of-pocket expenses for the properties, the purported buyers received their promised fees.

When the banks sent the buyers their monthly mortgage loan invoices, the buyers forwarded the invoices to co-defendant Diane Hayduk, Domenico's administrative assistant, in Miami, Florida.  The mortgage payments were paid

5

from the relevant loan proceeds, which had been deposited into joint accounts set up by Domenico and each of the buyers.

After a year, many of the buyers signed additional false loan applications for $1.5 million in "construction loans" funded by SunTrust Bank through SunTrust Mortgage. The monthly invoices for the SunTrust loans were paid off with checks from the joint accounts forged with the signatures of the buyers. All the while, unbeknownst to the buyers, Domenico used the joint accounts to make payments to entities such as "Spring Development Construction" and "Spring Mountain Estates," among others.

## C

All of the banks' loan proceeds to the straw buyers for the Hampton Springs development initially went into the Pavey & Smith law firm account. Early on, Mae deposited the proceeds into this account and authorized their release. Later, Domenico deposited the proceeds into the same account and authorized their release to "MAR Estates," a company run by Mae and the "seller" of the Hampton Springs lots. As a Pavey & Smith employee characterized the arrangement, Domenico, using the banks' money, was paying for the properties, and Mae was receiving the payments for the properties.

Domenico also released money from the Pavey & Smith account to the borrowers' joint accounts, to MOD Development, to Olivier and Davis (or to

6

companies controlled by them), and to other companies nominally controlled by Mae, such as "Estates of Lake View," "Spring Development Construction," and "D & R Mountain Contractors."

At some point in the scheme, after buyers Robert Ronk and Alejandro Suarez falsely claimed to have worked for Calcour Development, loan processors from Wachovia Bank and SunTrust Mortgage called Olivier to confirm their employment.  Olivier lied and told the loan processors that Ronk and Suarez worked for his company.  And after buyers Richard Singleton and Ronald Jones falsely claimed to have worked for Executive Mortgage and Investments, Inc., a SunTrust Mortgage loan processor called Davis to confirm their employment. Davis likewise falsely told the loan processor that Singleton and Jones worked for his company.

**D**

In the fall of 2007, a SunTrust Bank security officer noticed that some of the Hampton Springs loans had become delinquent.  Cary Mudge, a SunTrust Bank vice-president and special assets officer, examined 22 construction loans and seven lot loans and discovered that the borrowers' stated job descriptions did not match their stated incomes.  She determined that many of the borrowers did not work at their stated places of employment and that all of the loans in question had originated from one SunTrust Mortgage loan officer, co-defendant Victor Vidal.

7

In several instances Vidal knowingly had solicited fraudulent "CPA letters" from co-defendant Lazaro Perez, an accountant, who falsely had declared that certain borrowers had been self-employed.

In October of 2007, Mudge traveled to Cashiers, North Carolina, to determine whether the SunTrust Bank loans could be salvaged. She observed that no homes had been completed at the Hampton Springs development, and she learned that no available water, sewer, or electrical utilities were in place. Notably, no power plan had even been submitted to the regional power company for electricity, and the regional water company had recorded a lien on the property because it had never been paid to provide water and sewer services. Mudge estimated that SunTrust Bank alone had lost more than $18 million on its Hampton Springs loans.

## II.    TRIAL ISSUES

Domenico, Mae, Olivier, and Davis raise a number of challenges to the district court's trial rulings and the jury's verdict. We address them below.

**A.    The Denial of a Mistrial as to the § 1344(2) Counts Following the Supreme Court's Mid-Trial Decision in *Loughrin v. United States*, 134 S. Ct. 2384 (2014)**

Counts 2–15 charged Domenico, Mae, Olivier, and Davis with substantive violations of the bank fraud statute, 18 U.S.C. § 1344(1)–(2), through the submission of various fraudulent loan applications. As to these charges, the jury

8

found Domenico guilty of Counts 2–15; Olivier guilty of Counts, 4, 7, 9, and 11; and Davis guilty of Counts 10 and 14.[2]

The jury was instructed that bank fraud may be committed in two different ways. First, that the defendants, "knowingly, and with intent to defraud," executed a scheme to defraud one or more financial institutions, in violation of § 1344(1); or second, that the defendants, "knowingly, and with intent to defraud," executed a scheme to obtain the money of one or more financial institutions by means of false and fraudulent pretenses, in violation of § 1344(2).

When trial started in June of 2014, Eleventh Circuit precedent established that "intent to defraud" was an element of both §§ 1344(1) and 1344(2). *See United States v. Goldsmith*, 109 F.3d 714, 715–16 (11th Cir. 1997). And the Eleventh Circuit's pattern jury instructions conformed to this view. *See* Eleventh Circuit Pattern Instructions (Criminal), Offense Inst. 52 (2010 ed.). In their opening statements, the defendants told the jury that they acted in good faith and did not intend to defraud anyone.

During trial, however, the Supreme Court held that "intent to defraud" is not an element of a § 1344(2) offense. *See Loughrin*, 134 S. Ct. at 2387. In response to *Loughrin*, the district court removed the "intent to defraud" language from the § 1344(2) jury instruction.

---

[2] The jury acquitted Mae of Counts 5–6, 8–11, and 15.

9

Mae moved for a mistrial, arguing that the change in the law, and the removal of the "intent to defraud" language contained in the indictment, "effectively nullified" her theory of defense on the § 1344(2) charges (i.e. the lack of intent to defraud) and thereby deprived her of a fair trial. The district court denied the mistrial motion.[3]

Having decided to remove the "intent to defraud" language from the § 1344(2) instruction based on the decision in *Loughrin*, the district court abused its discretion, *see United States v. Trujillo*, 146 F.3d 838, 845 (11th Cir. 1998) (citation omitted), in denying the mistrial motion as to the § 1344(2) charges. Although a "part of the indictment unnecessary to and independent of the allegations of the offense proved may normally be treated as 'a useless averment' that 'may be ignored,'" *United States v. Miller*, 471 U.S. 130, 136 (1985) (citation omitted), our decision in *United States v. Cancelliere*, 69 F.3d 1116 (11th Cir. 1995), requires us to hold that we cannot sustain the jury's finding that the defendants in question violated § 1344(2).

In *Cancelliere*, the defendant was charged with various offenses, including money laundering. The money laundering counts in the indictment charged that the defendant acted "knowingly and willfully." The district court, however, redacted the indictment by removing the willfulness allegation, and its jury

---

[3] Because the district court had ruled that an objection by one defendant constituted an objection by all defendants, Mae's motion preserved the issue for Domenico, Olivier, and Davis.

instruction did not include willfulness as an element of money laundering. *See Cancelliere*, 69 F.3d at 1120.

Although the inclusion of willfulness in the *Cancelliere* indictment was unnecessary, we distinguished *Miller* and reversed the defendant's money laundering convictions. We explained that "changing the requirement from proof of 'knowingly and willfully' to 'knowingly' impermissibly broadened the bases for [the defendant's] conviction, even though willfulness is not required under the money laundering statute." *Id.* at 1121. And we rejected the government's argument that the error was harmless because the district court had used the word "willful" in defining the word "intentional": The defendant "prepared his defense to a charge of 'knowing and willful' money laundering . . . [and] his whole defense to this charge rested on his lack of willfulness. The government alleged it even though it need not have, and it must be charged with proving it." *Id.* at 1122.

We do not see any significant difference between *Cancelliere* and this case. In both cases, the government included legally unnecessary mens rea language in the indictment; in both cases the defendants asserted that they did not act with that mens rea; and in both cases the district court, after trial started, took the unnecessary mens rea issue away from the jury and broadened the bases for conviction. *See also United States v. Madden*, 733 F.3d 1314, 1322–23 (11th Cir.

11

2013) (holding that a constructive amendment of the indictment, which allowed for an alternative method of conviction, constituted plain error).

Due to this error, the bank fraud convictions of Domenico, Olivier, and Davis cannot be sustained under § 1344(2). But that does not require an outright reversal on the substantive bank fraud counts because "[b]ank fraud is established under two alternative methods." *United States v. Dennis*, 237 F.3d 1295, 1303 (11th Cir. 2001). Here, the indictment charged both methods, § 1334(1) and § 1334(2), and the jury was instructed on what had to be proven for each alternative. The jury found that Domenico, Olivier, and Davis committed bank fraud under § 1344(1). This is sufficient to sustain their convictions and sentences for bank fraud. *See Dennis*, 327 F.3d at 1303.[4]

## B.    Mae's Conspiracy Conviction

Mae argues there was insufficient evidence to support the jury's finding that she violated 18 U.S.C. § 1349 by engaging in a conspiracy to commit bank fraud (18 U.S.C. § 1344) and wire fraud (18 U.S.C. § 1343). Her argument principally relies on the assertion that there was no evidence (or insufficient evidence) that she was knowingly involved in her husband's criminal real estate fraud. She concedes there is evidence that, "acting at the direction of her ex-husband [she] undertook a

---

[4] We note that the special verdict form for Counts 2–15 required the jury to identify which method of bank fraud it found Domenico, Olivier, and Davis committed. Therefore, unlike a general verdict form, we know that the jury found that the elements of § 1344(1) had been proven beyond a reasonable doubt.

12

number of actions that assisted the mortgage fraud." But she claims that the evidence nevertheless "fails to support the inference that [she] *knew* that Hampton Springs was funded by a massive mortgage fraud rather than being a legitimate real estate development." Mae's Br. at 43, 46. We disagree.

There was sufficient evidence for the jury to find that Mae knowingly and voluntarily conspired to commit bank fraud and wire fraud. *See generally United States v. Moran*, 778 F.3d 942, 960 (11th Cir. 2015) (setting out the elements of a § 1349 conspiracy). Mae's sufficiency argument requires us to turn a blind eye to the evidence adduced a trial, but that is not the applicable standard. *See United States v. Gianni*, 678 F.2d 956, 958–59 (11th Cir. 1982) ("[W]e must view the evidence in the light most favorable to the Government, making all credibility choices in support of the jury verdict.") (citations and quotation marks omitted). At trial the government established that:

- Mae was the sole owner of MAR Construction, which was incorporated in 1995 and purchased the land that would become the Hampton Springs development.

- Mae's accountant explained her control of MAR Construction, and testified that he recognized her signature on documents and from the signature card for the company's bank account.

- Domenico's company, MOD, sent $8.1 million to MAR Construction.

- Mae did not apprise her accountant of the origin of the MOD project funds, *see* Mae's Reply Br. at 14 n.4, and the record establishes that rather than providing bank statements or checks, Mae gave her own

13

version of where the money had come from, for example, on documents titled "Prepared by Mae Rabuffo."

- MAR Construction wired roughly $6.1 million to Pavey & Smith, which had assisted with Hampton Spring's real estate closings. A paralegal at that firm noted that Mae faxed letters directing the law firm to release funds which would be used for fake deposits for straw purchasers for Hampton Springs lots. The letters were signed by Mae, and she referred to the money as "my funds" and herself in the exchanges as an "Investment Manager."

- Mae used large amounts of the funds, which were obtained through construction loans that were supposed to be used for developing the Hampton Springs project, for personal expenses, and even declared some of the money on her tax returns.

- No lots were ever developed in Hampton Springs.

This evidence, and the inferences that could reasonably be drawn from it, were sufficient for the jury to find Mae guilty of the charged conspiracy. *See United States v. Twitty*, 107 F.3d 1482, 1491–92 (11th Cir. 1997).

## C.    Intent to Harm a Federally Insured Financial Institution

Olivier argues that his § 1344 bank fraud convictions under Counts 7, 9, and 11 must be reversed because evidence at trial showed that the fraud scheme was aimed at SunTrust Mortgage, which was not a federally insured financial institution.[5] *See United States v. Key*, 76 F.3d 350, 353 (11th Cir. 1996) ("Proof of federally-insured status of the affected institution is, for both section 1344 and

---

[5] Olivier does not challenge his convictions for conspiracy to commit bank fraud (Count 1), and for bank fraud against Wachovia Bank (Count 4). Domenico adopts Olivier's entire brief by reference, but such general references do not comply with Eleventh Circuit Rule 28-1(f) and we therefore need not consider them. *See Moran*, 778 F.3d at 985.

14

section 1014, a jurisdictional prerequisite as well as an element of the substantive crime."). Put differently, Olivier asserts that without evidence establishing intent to defraud SunTrust Bank, we must set aside the convictions. Although Olivier did not raise this argument in the district court, we review it *de novo* because of its jurisdictional nature. *See United States v. Iguaran*, 821 F.3d 1335, 1336 (11th Cir. 2016).

In 2006 and 2007, the year the loans were originated, SunTrust Mortgage was not a qualifying "financial institution" under 18 U.S.C. § 20. Congress did not expand the definition of "financial institution" to include mortgage lending institutions until 2009. *See United States v. Stapleton*, 455 F. App'x 896, 899 n.1 (11th Cir. 2012) (discussing amendment).

As a threshold matter, we have no trouble concluding that the government proved SunTrust Bank's federally-insured status. *See United States v. McCarrick*, 294 F.3d 1286, 1290 (11th Cir. 2002). The government presented evidence about SunTrust Bank's corporate structure, as well as evidence that SunTrust Mortgage is a wholly-owned subsidiary of SunTrust Bank, that SunTrust Bank funded certain Hampton Springs loans, and that the loan proceeds were insured by the FDIC.

We review Olivier's challenge as an attack on the sufficiency of the evidence, *see Dennis*, 237 F.3d at 1303, and view the evidence presented in favor of the jury's finding. *See Key*, 76 F.3d at 353. In conducting this review, "[w]e do

15

not ask whether we believe that the evidence established guilt beyond a reasonable doubt; the 'relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Williams*, 865 F.3d 1328, 1344 (11th Cir. 2017) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original).

The indictment charged in Counts 7, 9, and 11 that the fraudulent submissions to SunTrust Mortgage were "for the purpose of obtaining a lot loan . . . funded by SunTrust Bank." Indictment, D.E. 3, at 20–21. Our precedent establishes that the "issue is whether [Olivier] knew or intended that his conduct might place [SunTrust Bank], the insured institution, at risk of financial harm." *Key*, 76 F.3d at 353. A defendant need not make direct contact with the federally-insured institution, so long as his purpose was to influence the actions of that institution. *See id. See also United States v. Bouchard*, 828 F.3d 116, 127 (2d Cir. 2016) ("Of course, the Government might have been able to prove that Bouchard knew that money from mortgage lenders came from banks by virtue of his knowledge of the industry.").

The evidence presented at trial provided a sufficient basis for the jury to conclude that Olivier, like the other defendants, knew that his conduct might place SunTrust Bank (and not only SunTrust Mortgage) at risk of financial harm.

16

Olivier, an experienced real estate developer, operated Calcour Development. He recruited several investors for the Hampton Springs development and informed them that their mortgage loans would be rolled into construction loans, which were made by SunTrust Mortgage. Olivier and his wife Tammy were also involved in completing and submitting the fraudulent construction loan applications to SunTrust Mortgage. And, when Cary Mudge of SunTrust Bank contacted Olivier as part of her investigation into the Hampton Springs development, Olivier expressed no surprise that an employee of SunTrust *Bank* was the contact person for the construction loans obtained through SunTrust *Mortgage*. Nor did Olivier express any surprise that SunTrust Bank would be handling any draw requests on the loans. Instead, Olivier was "very nice…[v]ery friendly" to Ms. Mudge and asked to come meet with her in person at SunTrust Bank's Atlanta headquarters. D.E. 534 at 217:20–24. A reasonable jury could find that Olivier's overall conduct, including his lack of surprise and his willingness to work directly with SunTrust Bank, indicated his prior knowledge that SunTrust Bank funded SunTrust Mortgage's construction loans. *See United States v. Peters*, 403 F.3d 1263, 1268 (11th Cir. 2005) ("A jury is free to choose among reasonable constructions of the evidence.").

Olivier urges us to follow the reasoning in *United States v. Bennett,* 621 F.3d 1131, 1138 (9th Cir. 2010), in which the Ninth Circuit held that federally-insured

17

Bank of America's whole ownership of Equicredit was insufficient to support a conviction under § 1344. We do not believe *Bennett* is applicable here.

In *Bennett*, the defendant perpetrated fraud against Equicredit, which, like SunTrust Mortgage, was an entity not included in the definition of "financial institution" at the time of the crime. *See id*. at 1136. The government argued that the jurisdictional requirement was met only because Bank of America owned Equicredit and that, therefore, the defendant fraudulently obtained assets "owned by" the insured institution when he obtained mortgages from Equicredit. *See id.* Relying on principles of corporate law, the Ninth Circuit explained that "a parent corporation does not own the assets of its wholly-owned subsidiary by virtue of that relationship alone." *Id.* Importantly for our purposes, however, the Ninth Circuit explicitly noted that the government did not argue that Bank of America had "custody or control" over Equicredit's funds and conceded "that the record would not support such a finding." *Id*. at 1138–39. Likewise, the government did not appear to argue, consistent with our holding in *Key*, that the defendant knew or intended that his conduct might place Bank of America, the insured institution, at risk of financial harm. *Bennett*'s singular focus on ownership and explicit findings that the government did not present evidence of custody or control distinguish that case from the situation presented before us. *See id.* at 1139.

18

Instead, we think this case is more like *United States v. Puckett*, No. 3:14-00101, 2016 WL 3745360, *5 (M.D. Tenn. July 13, 2016), where the Middle District of Tennessee found sufficient evidence that the defendant sought to obtain the property of SunTrust Bank, not merely its subsidiary SunTrust Mortgage. In *Puckett*, as here, the government presented testimony concerning the close relationship between SunTrust Bank and SunTrust Mortgage, including how losses and expenses at SunTrust Mortgage affect SunTrust Bank. *Compare id*. at *3–4 *with* D.E. 534:109–116*.* Further, as here, the defendant's experience, involvement in the scheme, and interactions with SunTrust Bank presented sufficient evidence that he was aware that the scheme would affect SunTrust Bank. *Compare id.* at *5 (citing experience in industry and involvement in loan issuances) *with* D.E. 528:139–146, 182–185; D.E. 534:213–214, 217–218. And, finally, the court noted "the names of the wholly-owned subsidiaries at issue here were substantially similar to their parent financial institutions. It was reasonable to infer, therefore, that the [d]efendants were aware that the fraudulently obtained funds were owned, or were under the custody or control of the parent financial institutions." *Id*. at *5.

The same is true here. *See Williams*, 865 F.3d at 1346 ("The jury was free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial."). Given the evidence presented, the jury could have reasonably found that Olivier knew the fraudulent loan applications would place

19

SunTrust Bank at a risk of harm, thereby satisfying the jurisdictional and substantive requirements of § 1344. *See Key*, 76 F.3d at 353.

## D.    The Department of Justice's Settlement with SunTrust Bank

Olivier and Davis make a number of arguments regarding the exclusion of evidence concerning SunTrust Mortgage's conduct and SunTrust Bank's billion-dollar settlement with the Department of Justice. They contend that the district court improperly excluded certain evidence and improperly instructed the jury. At rock bottom, these arguments rest on the contention that bad conduct by SunTrust Mortgage and its employees undercut the government's case, and was relevant to whether they (and their co-defendants) committed bank frank. *See* Davis' Br. at 25–35 (arguing that the defense "hinged on the allegation that SunTrust was committing crimes and fraud," and that the failure to disclose the litigation—which settled and was made public during trial—was a violation of *Brady v. Maryland*, 373 U.S. 83 (1963)); Olivier's Br. at 73–75 (arguing that the exclusion of a settlement for loose loan underwriting practices cut evidence from trial that would have materially undercut the government's case and materially prejudiced defense); Davis' Br. at 36–41 (arguing that the district court erred by giving a jury instruction that foreclosed the jury from finding that SunTrust Mortgage was involved with the fraud, and may have misled the jury that the bank should not be responsible for its fraud); Olivier's Br. at 70–72 (arguing that a jury instruction

20

was erroneous because SunTrust Bank should be held responsible for its participation in the fraud).

These arguments share at least one fatal flaw: "the gravamen of § 1344 is the 'scheme,' rather than 'the completed fraud,' and . . . the offense therefore does not require 'damage' or 'reliance.'" *Loughrin*, 134 S. Ct. at 2397 (quoting *Neder v. United States*, 527 U.S. 1, 25 (1999)). Olivier and Davis contend that they could not have committed bank fraud because, even if SunTrust Mortgage knew their mortgage applications contained false representations, the applications would have been approved anyhow. This argument, however, misses the mark. "Because the focus . . . is on the violator, the purpose of the element of materiality is to ensure that a defendant actually intended to create a scheme to defraud." *United States v. Svete*, 556 F.3d 1157, 1165 (11th Cir. 2009). So "a false statement can be material even if the decision maker actually knew or should have known that the statement was false." *United States v. Neder*, 197 F.3d 1122, 1128 (11th Cir. 1999) (citation omitted). *See also United States v. Gregg*, 179 F.3d 1312, 1315 (11th Cir. 1999) (rejecting argument that misstatement was not material because bank did not rely on "false assurances"); *United States v. Lindsey*, 850 F.3d 1009, 1014 (9th Cir. 2017) (observing in the wire fraud context that "[t]wo wrongs do not make a right, and lenders' negligence, or even intentional disregard, cannot excuse another's criminal fraud"). Our precedent thus establishes that whether SunTrust Mortgage

21

and SunTrust Bank—given their underwriting practices—would have or in fact did rely on the fraudulent statements contained in the mortgage applications does not undermine the fairness of the trial or the jury's findings.

Olivier and Davis also fail to adequately address the district court's ruling that, even if SunTrust Mortgage's conduct and SunTrust Bank's settlement with the Department of Justice were marginally relevant, such evidence was outweighed by potential jury confusion. We do not see any abuse of discretion in the district court's application of Rule 403.

Finally, the settlement, as outlined in the Department of Justice press release relied upon by Olivier and Davis, concerned SunTrust Mortgage's "widespread underwriting failures that helped bring about the financial crisis." Even putting aside the information's atmospheric relevance, that factual backdrop was adequately presented to the jury. The jury heard that SunTrust Mortgage's guidelines for obtaining a mortgage loan "were fast and loose" in 2007, and that an employee had initiated a whistleblower lawsuit against her group of loan processors concerning the institution's loan origination practices. This was enough to provide the jury an accurate picture of SunTrust Mortgage's underwriting practices at the time.[6]

---

[6] For similar reasons, we reject the argument made by Olivier and Davis that the government violated *Brady* by failing to disclose the DOJ's litigation with SunTrust Bank.

**E.    The District Court's Grant of Domenico's Request to Leave the Courtroom During the Trial Proceedings**

Domenico argues that the district court committed reversible error when it permitted the trial to continue in his absence after he requested to be excused due to illness. He contends, for the first time on appeal, that this absence was involuntary because, as his trial counsel explained to the district court, he was not feeling well. *See* Domenico's Br. at 37. We reject his argument.

Federal Rule of Criminal Procedure 43(c)(1)(A) provides that a "defendant who was initially present at trial . . . waives the right to be present . . . when [he] is voluntarily absent after the trial has begun, regardless of whether the court informed [him] of an obligation to remain during trial[.]" Defense counsel asked that Domenico be excused at various times throughout the trial. Then, after twice waiving Domenico's presence, and having his client absent during portions of the proceedings, counsel engaged in the following exchange with the district court:

> Defense Counsel: The other thing, Your Honor. My client has been kind of ill for the last couple of days. I noticed he's been having some problems being able to concentrate and stay awake.
>
> The marshal had brought it to my attention that at lunchtime there was some concern for him, and I wanted to bring that to the court's attention.
>
> He said he was going to try and hang in there and he's doing his best. I'm just not sure whether he needs medical care.
>
> The Court:  Well, if he needs to be absent for any reason, just indicate that to me, and we'll excuse him and I'll explain to the jury that he's

23

not present and they shouldn't draw any inference one way or the other as to why he's not present in court.

Defense Counsel:  Thank you, Your Honor.

D.E. 536 at 156:1–16.  The trial moved forward with Domenico present, and after four more witnesses testified, counsel again engaged the court in discussion:

Defense Counsel: My client is not doing very well, Your Honor.

The Court: Okay. So do you want to go ahead and –

Defense Counsel: Yes.

The Court: We'll just go ahead and allow him to do, take off the rest of the afternoon.

Defense Counsel: Thank you, Your Honor.

The Court: Okay. Do [you want] me to say anything to the jury?

Defense Counsel: When they come back, Your Honor.

The Court: But you don't want me to say -- draw their attention to the fact that he's not here.

Defense Counsel: Let me think about it.

*Id.* at 221:25–222:12.  Domenico left, and apparently did not return until the next day.

Defense counsel never asked that the district court give an instruction concerning Domenico's absence, never requested that the proceedings be stayed until his return, never suggested that his absence was prejudicial, and never asked

24

for any corrective measure.  Instead, counsel continued to zealously advocate on Domenico's behalf and the issue was laid to rest until this appeal.

On this record, and under Rule 43(c)(1)(A), Domenico was voluntarily absent following his counsel's request.  *See United States v. Sterling*, 738 F.3d 228, 235 (11th Cir. 2013) ("Rule 43 allows a trial to proceed if the defendant was initially present at trial and constructively waived his right to be present by voluntary absence.") (citation and ellipsis omitted).  *See also United States v. Gagnon*, 470 U.S. 522, 529 (1985) ("We hold that failure by a criminal defendant to invoke his right to be present under Federal Rule of Criminal Procedure 43 at a conference which he knows is taking place between the judge and a juror in chambers constitutes a valid waiver of that right."); *United States v. Brantley*, 68 F.3d 1283, 1291 (11th Cir. 1995) ("Failure to assert the right to presence or to object to a violation of Rule 43 may constitute a valid waiver.") (citing *Gagnon*, 470 U.S. at 526).  That voluntary absence dooms his claim.

Even if there was any Rule 43 error, it was invited.  *See United States v. Brannan*, 562 F.3d 1300, 1306 (11th Cir. 2009).  The cited exchanges show that the absence was a consequence of defense counsel requesting that Domenico be excused, which came on the heels of similar prior requests.  It therefore cannot be the basis for a new trial.  *See United States v. Lawrence*, 161 F.3d 250, 255 (4th Cir. 1998) ("Because Lawrence was present at the beginning of his trial and

25

voluntarily absented himself, there is no error in this case.  Even if there be error, it is invited error brought on at Lawrence's own request and, as such, is not reversible.").

## III.    SENTENCING ISSUES

Domenico, Mae, Olivier, and Davis also challenge their sentences on a number of grounds.[7]

### A.    The Loss Amount of Greater Than $50,000,000 for Mae, Olivier, and Davis[8]

Mae, Olivier, and Davis contest the district court's loss calculation of greater than $50,000,000, arguing that the total loss amount in this matter was not reasonably foreseeable to them.  The district court, however, did not clearly err by concluding a sentencing enhancement was appropriate for Mae, Olivier, and Davis because a loss amount of greater than $50,000,000 was reasonably foreseeable. *See* U.S.S.G. § 2B1.1(b)(1)(M) (providing for a 24-level increase for a fraud offense involving between $50,000,000 and $100,000,000 in losses); *United States v.*

---

[7] As noted, Domenico's general adoption by reference of his co-appellants' entire briefs is insufficient under Eleventh Circuit Rule 28-1(f).  We therefore do not individually address Domenico's sentence and note that several of the individual arguments discussed in this part of the opinion (such as a minimal role sentencing reduction) could not apply to Domenico, who was the architect of this fraudulent scheme.  For those arguments which do apply, our reasons for affirming the sentences of Mae, Olivier, and Davis apply with equal (if not more) force to Domenico.

[8] Although the calculation of the total loss amount of greater than $50,000,000 for the entire scheme was challenged at sentencing, Mae, Olivier, and Davis do not contest that total calculation on appeal.

*Medina*, 485 F.3d 1291, 1303–04 (11th Cir. 2007) (noting that we review the district court's findings of fact with respect to loss for clear error).

The evidence supports the district court's loss determination as to these individual defendants. Mae was, as noted, responsible for acts that supported the heart of the conspiracy, including the purchase of lots central to the Hampton Springs fraud, along with the transfer, control, and management of funds key to the success of the fraud and use of straw purchasers to further the scheme. Her involvement with the scheme, coupled with her covering up the true nature of the scheme's funds to her accountant, is enough to establish her role, knowledge, and participation in the entire conspiracy, and is sufficient to hold her responsible for over $50,000,000 in losses. *See United States v. Rodriguez*, 751 F.3d 1244, 1256 (11th Cir. 2014) (holding that defendant in mortgage fraud scheme "participated in the conspiracy and did not withdraw from it, thus she [was] responsible for the losses resulting from the reasonable foreseeable acts of co-conspirators in furtherance of the conspiracy"); *Moran*, 778 F.3d at 975 (finding that fraud defendant was responsible for entire amount Medicare was billed during scheme and rejecting "argument that his loss amount should be limited to the billings for only his individual patients and his personal actions").

The record also supports the loss determination for Olivier and Davis. The district court explained that the jury found both men guilty of being members of

27

the conspiracy to commit bank fraud, which the court concluded established the conduct and knowledge necessary to support the 24-level enhancement. In so ruling, the court did not clearly err. The evidence showed that Olivier and Davis were intimately involved with the entire scheme by, for example, recruiting straw purchasers, falsely listing their companies as places of employment in the straw purchasers' mortgage financing documents, then confirming that false information when banks called to verify. The evidence also confirmed they were sophisticated real estate professionals who understood the magnitude and nature of the criminal enterprise they were supporting and furthering. Olivier had been involved in the real estate construction space for years,[9] and Davis had been involved in the mortgage financing industry and had closed thousands of no-income verification loans.[10] In sum, Olivier and Davis were not only instrumental to the success of the criminal scheme, but the evidence and the jury's findings of guilt supported the conclusion that they were fully involved and knowledgeable of its scope. *See Rodriguez*, 751 F.3d at 1256–57; *Moran*, 778 F.3d at 975.

---

[9] Olivier's trial counsel explained he had been involved in "121 different building projects from all different types of positions regarding engineering, construction, and architectural drafting. Basically anything and everything that was regarding construction." Sentencing Tr., D.E. 521, at 59:18–25.

[10] According to a SunTrust Bank employee, Davis was, in his own words, the owner of Executive Mortgage, and closed "thousands of non-income verification loans." Sentencing Tr., D.E. 521, at 9:16–21.

28

**B.      The Sophisticated Means Enhancement**

The Sentencing Guidelines provide for a two-level enhancement if an offense involves "sophisticated means."    U.S.S.G.  §  2B1.1(b)(10)(C).    The Guidelines define sophisticated means as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of the offense."  *Id*., comment 9(B).  The enhancement is appropriate if that the defendant engaged in "repetitive, coordinated conduct designed to allow him to execute fraud and evade detection."  *United States v. Bane*, 720 F.3d 818, 826–27 (11th Cir. 2013).   We consider the enhancement a finding of fact and review its application for clear error.  *See United States v. Ghertler*, 605 F.3d 1256, 1267 (11th Cir. 2010).

Hiding assets or transactions "through the use of fictitious entities, corporate shells, or offshore financial accounts" ordinarily amounts to use of sophisticated means.  *Id.* (citation and quotation marks omitted).  And "there is no requirement that each of a defendant's individual actions be sophisticated in order to impose the enhancement.    Rather, it is sufficient if the totality of the scheme was sophisticated."  *Id.* (citations omitted).

Our review of the record shows the district court did not clearly err in applying the sophisticated means enhancement.  The conspiracy here involved a notable  recruitment  scheme,  which,  among  other  things,  entailed  using

29

"companies" that verified false employment and salary information to obtain real estate financing, the purchase of a large number of real estate lots, and a carefully orchestrated transfer of funds between corporate entities to further the scheme and avoid detection. We have upheld this enhancement in similar mortgage fraud schemes that involved the use of straw buyers, fraudulent mortgage documents, and multiple corporate entities. *See Rodriguez*, 751 F.3d at 1258. And, Olivier and Davis were sufficiently involved in this process to support the enhancement. *See Ghertler*, 605 F.3d at 1267.

## C. The Managerial or Supervisory Role Enhancement

A district court may enhance a defendant's offense level under § 3B1.1(b) by three levels if "the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." To determine a defendant's role in the offense a court should consider:

> the exercise of decision making authority, the nature of the participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of illegal activity, and the degree of control and authority over others.

*Id.*, comment 4. All these factors need not be present, but are instead "merely considerations for the sentencing judge." *United States v. Martinez*, 584 F.3d 1022, 1026 (11th Cir. 2009) (citations and quotation marks omitted).

30

Sufficient evidence supported application of this enhancement for Olivier and Davis. We have repeatedly held that recruitment of others into a criminal enterprise, especially when combined with other elements of criminal involvement by the recruiter, will support the enhancement. *See e.g.*, *United States v. Caraballo*, 595 F.3d 1214, 1232 (11th Cir. 2010) (noting that we have applied the § 3B1.1(a) enhancement where "there was evidence that the defendant had recruited participants, had instructed participants, or had wielded decision-making authority"); *United States v. Ndiaye*, 434 F.3d 1270, 1304 (11th Cir. 2006) (upholding application of the enhancement where the "record reflect[ed] that Sumbodo exercised authority over the organization by recruiting and instructing co-conspirators"); *United States v. Thomas*, 446 F.3d 1348, 1355 n.2 (11th Cir. 2006) ("Finally, the role enhancement was supported by Detective Sanchez's testimony that Thomas recruited the others and co-defendant Castillo's testimony that Thomas recruited him.").

The record belies the attempt of Olivier and Davis to portray the straw purchasers they recruited as hapless, unknowing victims. The testimony shows most such purchasers were willing participants in a scheme that required them to make or permit material misrepresentations in their loan applications. *See, e.g.,* Trial Tr., D.E. 528, at 158–202 (Olivier recruited Ms. Baker, who signed false loan applications and knew what she was doing was wrong); D.E. 529 at 80–117

31

(Olivier recruited and worked with Mr. Barmoha, including submitting false information in loan applications); D.E. 532 at 3–13, 215–244 (Davis recruited Mr. Singleton, who filled out a false loan application but claimed to not have read the application); D.E. 533 at 19–63, 190–213, 252–256 (Davis recruited Mr. Jones, who signed false loan applications). This evidence, coupled with Olivier and Davis falsely listing their "companies" as places of employment for the straw purchasers, and in certain cases actually verifying that information when banks called, was enough.

In sum, the involvement of Olivier and Davis evinces their knowledge of the scope and nature of the criminal activity, and a material level of control and management within the enterprise. This was sufficient to warrant application of the § 3B1.1(b) enhancement.

## D.    The Gross Receipts Enhancement

We review the district court's legal conclusions concerning application of the Sentencing Guidelines *de novo*, and the court's factual findings for clear error. *See United States v. Cruz*, 713 F.3d 600, 605 (11th Cir. 2013). When applying the Guidelines we first resort to their plain meaning, and absent ambiguity, no further divination is required. *See id.* at 607.

The Sentencing Guidelines provide for a two level enhancement under § 2B1.1(b)(16)(A) where "the defendant derived more than $1,000,000 in gross

32

receipts from one or more financial institutions as a result of the offense." "[T]he defendant shall be considered to have derived more than $1,000,000 in gross receipts if the gross receipts to the defendant individually, rather than to all participants, exceeded $1,000,000." *Id.*, comment 12(A).

The district court did not clearly err by concluding Mae obtained more than $1,000,000 in gross receipts from the conspiracy. Evidence at trial established that over $8,000,000 was transferred to a corporation that was solely owned by Mae, and that she actually spent more than $1,000,000 from those funds on personal expenses.

## E.    The Denial of a Minimal Role Reduction

A district court's determination of a defendant's role in an offense is a finding of fact that we review for clear error. *See United States v. Barrington*, 648 F.3d 1178, 1200 (11th Cir. 2011). The district court has "considerable discretion in making this fact-intensive determination." *United States v. Boyd*, 291 F.3d 1274, 1277–78 (11th Cir. 2002). A defendant bears the burden to establish qualification for a minimal role reduction by a preponderance of the evidence. *See United States v. Alvarez-Coria*, 447 F.3d 1340, 1343 (11th Cir. 2006). Minimal participation may be found where a defendant lacks "knowledge or understanding of the scope and structure of the enterprise and of the activities of others." U.S.S.G. § 3B1.2, comment 4.

33

The district court did not clearly err in finding that Mae was not entitled to a minimal role reduction. The evidence at trial showed she was involved with the purchase of land central to the bank fraud conspiracy, that she was involved with managing, moving, and disbursing the money needed to fund the conspiracy, and that she was not forthright to her accountant about the nature of conspiracy funds. As the district court noted, "everybody had a part here, and she played an integral and essential part to the success of the scheme while it was ongoing. So to that extent, there is no—she's hardly a damsel in distress. She was in for a penny and for a pound." Sentencing Tr., D.E. 576, at 31:1–5. We agree with the district court's assessment.

## F.    The Procedural and Substantive Reasonableness of the Sentences

We review the reasonableness of a sentence for abuse of discretion. *See United States v. Hayes*, 762 F.3d 1300, 1325 (11th Cir. 2014) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). Appellate courts follow a two-step process to determine whether a sentence falls within the bounds of this discretion. *See Gall*, 552 U.S. at 51. We first examine whether the sentence was procedurally sound. Then, if the sentence passes procedural muster, we determine whether it was substantively correct. *See id.* We will reverse a procedurally sound sentence only if "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence

34

that lies outside the range of reasonable sentences dictated by the facts of the case." *United States v. Pugh*, 515 F.3d 1179, 1191 (11th Cir. 2008).

Mae, Davis, and Olivier argue that the district court committed procedural and substantive sentencing errors which warrant reversal. At the end of the day, we are not persuaded. When sentencing Mae to 168 months, the district court explicitly weighed a number of factors on the record, including the complexity of the scheme, her personal background, her age, medical condition, harm involved, the need to protect the public, deterrence, and the need to promote respect for the law. The district court thus considered the § 3553(a) factors and the numerous considerations at play when sentencing.

The sentence is also supported by the record. Mae engaged in activities that were central to the criminal enterprise and supported the inference, which the jury found, that she knowingly supported and furthered the real estate conspiracy. Despite her objections at sentencing, and now on appeal, there is insufficient rebuttal evidence to the contrary.

The same is true for Olivier and Davis. When sentencing Olivier to 240 months, after an extensive back and forth with counsel, the district court calculated his guideline range on the record, acknowledged Olivier's  history and characteristics, and stated it was imposing a sentence after considering the § 3553(a) factors, the statements of all parties, and the presentence report that

35

contained the advisory guidelines. Then, when sentencing Davis to 240 months, the court explained it had considered the parties' arguments, Davis' presentence report (which the court noted contained the advisory guideline range), and the § 3553(a) factors. It then explicitly referenced a number of those factors on the record, and incorporated its comments when sentencing Olivier. We can discern no sentencing error from the record.

Olivier and Davis nevertheless argue their conduct amounted to nothing more than being low-level players in a massive mortgage fraud scheme. As a result, the argument goes, their sentences should be reversed because they should only be liable at sentencing for the narrow scope of their participation, *i.e.*, the loans they specifically helped get approved by the banks. They argue the district court committed the same error here that gave us grounds to reverse in *United States v. Hunter*, 323 F.3d 1314 (11th Cir. 2003). There, the district court failed to make particularized findings regarding the scope of low-level check cashers in a larger check cashing scheme, and, as a consequence, imposed sentencing liability for the full monetary loss of the scheme rather than for the defendants' limited involvement in cashing certain checks. *See id*. at 1320–22. We reversed, concluding that the district court failed to make individualized findings and because the record made apparent that sentencing liability outstretched the scope of the defendants' participation in the check-cashing scheme. *See id.*

36

But *Hunter* is inapposite to the facts of this case because Olivier and Davis were not the real estate equivalents of low-level check cashers.  Although not on all fours, this case is more like *United States v. McCrimmon*, 362 F.3d 725 (11th Cir. 2004), where we affirmed the sentence of a higher-ranking member of a conspiracy who was fully aware of the objectives of the enterprise and actively involved in recruiting investors into the scheme.  In *McCrimmon*, we explained that, given the defendant's scope of knowledge and participation in the scheme, the district court correctly concluded he was liable at sentencing for the full loss of the conspiracy.  *See id*. at 732–33.  We were also careful to draw limitations concerning the reach of *Hunter*, explaining that our "logic at work in *Hunter*" "cannot apply" when a defendant was "certainly not a low-end operative merely aware that he was participating in some sort of criminal ring." *Id.* at 733.

The reasoning in *McCrimmon* applies with equal strength here.  Olivier and Davis were not unwitting participants in the real estate fraud; nor were they unaware of the nature or scope of the scheme.  They were, instead, mid-level sophisticated operators who supported the scheme with full knowledge and cooperation by recruiting straw purchasers and assuring that the false information listed in bank applications would pass inspection.  Indeed, the evidence showed they were intimately involved with the scheme by, for instance, recruiting straw purchasers, falsely listing their companies as places of employment in the straw

37

purchasers' mortgage applications, and verifying that false information when the banks called to confirm. They were also experienced real estate professionals sophisticated enough to understand the magnitude and nature of the criminal enterprise they were supporting and furthering.

Accordingly, we conclude the district court's sentences of Mae, Davis, and Olivier were not an abuse of discretion. The defendants' arguments and our review of the record give us no basis to reverse.

## VI

For the reasons stated herein, we conclude that the bank fraud convictions of Domenico, Olivier, and Davis cannot be sustained under § 1344(2). But, because the jury found these defendants also committed bank fraud based upon their violation of § 1344(1), we affirm their convictions and sentences for bank fraud. We also affirm in all other respects.

**AFFIRMED.**

38